FOR PUBLICATION

IN THE SUPREME COURT OF TENNESSEE

AT NASHVILLE

TAMMY R. GANZEVOORT,          (
                              (
    Plaintiff-Appellant,     (
                              (
                              ( Sumner Circuit
                              (
v.                            ( Hon. Thomas Goodall, Judge
                              (
                              ( S. Ct. No. 01S01-9602-CV-00040
RICHARD B. RUSSELL, MARTHA T.   (
RUSSELL, AND JIM CASSETTY d/b/a  (
JIM CASSETTY REALTY,         (
                              (
 Defendants-Appellees.     (

For Plaintiff-Appellant:               For Defendants-Appellees:

Michael W. Edwards                   John R. Bradley
Hendersonville                       Hendersonville

# O P I N I O N

JUDGMENT OF COURT OF APPEALS
AFFIRMED; JUDGMENT OF TRIAL COURT
REVERSED.                                      REID, J.

This case presents for review the decision of the Court of Appeals reversing the trial court and dismissing an action for violation of the Tennessee Consumer Protection Act[1] brought by the purchaser of residential real property against the seller and the seller's broker. The judgment of the Court of Appeals dismissing the suit is affirmed.

**I**

The subject of this suit is a house and lot located in Hendersonville, Tennessee, which was purchased by defendants Richard Russell and Martha Russell in 1969. The property was occupied as a residence by the Russells until 1991, when Martha Russell moved in connection with their divorce.[2] Richard Russell and his child continued to occupy the premises until a short time prior to June 3, 1993, the date on which the property was conveyed to the plaintiff, Tammy R. Ganzevoort.

In the latter part of 1992, the house and lot were listed for sale with Jim Cassetty Realty, a real estate agency owned by the defendant Jim Cassetty, who is a broker,

---

[1]Tenn. Code Ann. §§ 47-18-101 to 47-18-5002 (1995).

[2]The Court of Appeals dismissed the suit against Martha Russell, from which there is no appeal.

and his wife, Pat Cassetty, who is an agent.  The plaintiff was represented by real estate agent Judy Cassetty. (Judy Cassetty is not related to Jim and Pat Cassetty.)

On February 1, 1993, the parties entered into a contract for the sale of the property for $68,500.  The closing was set for May 31, 1993.  The sale was subject to approval by the United States Department of Housing and Urban Development of a Federal Housing Authority (F.H.A.) loan.  F.H.A. required an inspection by a representative of that agency, an appraisal by an appraiser approved by F.H.A., and a professional termite inspection.

The F.H.A. inspection revealed the need for some minor repairs but did not mention the defects on which this suit is based.  Those repairs were made.

The real estate appraiser approved by F.H.A. inspected the property in the process of preparing an appraisal.  During that inspection, he examined the house's underpinnings but found no defects in the floor joists or the subflooring.  He only required the purchaser to have knowledge of a sump pump located beneath the house and that it be in working condition.  A copy of the appraiser's report was given to the purchaser on May 12, 1993, several days

prior to the closing.

An employee of a pest control company made an inspection of the house on May 25, 1993. His report showed there was no evidence of termite infestation or damage. The termite inspector did, however, find water damage under the bathroom, which he verbally reported to Jim Cassetty. He testified:

> It wasn't a problem that I would normally put on this report simply because it was the deterioration of subflooring under the bathroom, under the main bathroom of the house. And I just took note of that as I was inspecting it . . . .
>
> When I went under the bathroom I did see that the subflooring was damaged, and it was obviously moisture damage. It looked to me, and I've looked at a few of them, it looked like a drain type leak. It wasn't dripping water. It looked like something where maybe when the bathtub -- when the commode was flushed or the bathtub was drained or the shower drain, whatever, was getting in there and damaging the wood.
>
> Since there was no structural damage, that's the reason I didn't put it on my report. But I did report it to the Cassetty agency. I do this as a matter of courtesy. If I find a plumbing leak or anything like that under a house I'll usually tell the agent so they're aware of it and they can get it repaired.
>
> . . . .

It was obvious there had been a leak there at some time and that it had damaged the subflooring, but not the floor joists themselves.  So it wasn't structural, and that's why I didn't put it on my report.

The termite inspector told an employee of the Cassetty agency, "Look, there's no problem with . . . termites. . . . By the way, though, tell Jim that some of the subflooring under the bathroom has been damaged by water and it looks like a drain leak because there is no water dripping right now."

Apparently, the termite inspection was made while Jim Cassetty was out of town.  Jim Cassetty testified:

Well, I come back from being out of town and had a report from the Allied Pest Control that they had inspected the property and issued the letter but recommended that the exterior, the underside of the property under the bathroom be refurbished, renovated and strengthened.

I talked to [the termite inspector] about that.  He suggest[ed] laminating or scabbing -- I understand laminating as being a plank on each side of the plank -- or scabbing where you put only one plank on.  I informed [the termite inspector] that [the carpenter] would do that.

. . . . I went out there and looked at the area, and then I hired a man name of Bob Murdock to repair it.  Mr. Russell

was out of town, I contacted him, told him what the requirement was, told him that there was going to be some $300 or so to make the repairs. He authorized [me] to go ahead and have it fixed, and I did so.

. . . .

Well, it looked like an old leak. It looked like it was something that had happened five or 10 years earlier. I thought it was just precautionary. Until you start taking up carpet and ripping back paneling and taking off all of this protective paper, it wasn't visible.

The carpenter described the conditions found and the repairs made:

there was one joist that was in pretty bad shape. I put a 2 x 10 or a 2 x 12 up on the block wall on the outside of the house, ran it back 3 or 4 feet on the good end of the joist. And then on the floor up there, it was a little bit discolored, I brought it around on it. It was dry and still firm and intact. I put some plywood up against that. And the two joists on both sides of it, I put splices on them.

Then I had to kind of put pressure on it to jack it up to make sure everything was up tight against the floor. I went inside to make sure there was no cracks or anything in the grout on the tile in the bathroom. Everything was intact. It was fine. Everything was dry.

Prior to closing, the seller's agent told the

buyer's agent, according to the testimony of Judy Cassetty

> "There was a piece of wood replaced underneath the house, but don't worry about it.  It was just a little minor piece of wood.  Jim said underneath the house everything is fine."  And I did tell [the plaintiff] that.
>
> I said that there is a clear termite letter; there was a piece of wood replaced; they're saying everything is fine, he went under it.  But we did see the sawdust out there, and I said, "Well, that must explain the sawdust."

Pat Cassetty's version of the discussion was:

> As I explained it, it was that the termite fellow had told us that there was some damage there.  He had just -- he said there was some damage there, and we'd check it out when we came home.  And Mr. Russell wanted everything to be done for the house.  We did what we thought was the proper thing to do.  The cost we incurred was put on the closing statement, so I was telling them that we found this at the last moment and that we had corrected and this was the cost.

There is no evidence that Russell had any information about the defects other than that given him by Cassetty and the carpenter.  Russell authorized the repair work recommended and agreed that the cost, estimated at $300, be charged to him at the closing.

Even though the plaintiff and her agent looked at the house several times prior to closing, they apparently did not see any indication that the bathroom floor was damaged. The plaintiff did not discuss the condition of the floors with the seller prior to closing. The plaintiff testified that she relied upon her personal inspection, the F.H.A. report, and the termite letter. She does not claim that she relied upon any representation made by the seller or the seller's agent.

After all the reports required by F.H.A. had been filed, that agency issued its approval of the house as collateral for the plaintiff's loan.

After the sale had been closed, the plaintiff discovered, upon removing the carpet in the dining area near the bathroom, that a section of the hardwood floor, approximately 3 feet by 3 feet in area, was rotten. Further inspection revealed that water leaking from the shower and commode had caused extensive damage to the bathroom floor where the repairs had been made and also to the floor and floor joists under the adjoining dining area.

An engineer engaged by the plaintiff described the condition as follows:

The carpet that had gotten wet in
[the] dining room had been pulled back
and there was a hardwood floor underneath
the carpet.  Within 3 or 4 feet of the
wall that hardwood was very badly
damaged, in some cases completely
decomposed; so the damage had been going
on for some time.

There was no evidence, in the
bathroom, of any deterioration at that
time, from looking inside the bathroom;
but going underneath the house in the
crawl space the floor joist had been
damaged by the water.  The plywood
subfloor had completely delaminated, the
bonding between the layers of the plywood
were separated.

The floor joists were very wet and
had decayed somewhat; and someone had
gone in at some previous time, I don't
know when, and tried to repair the floor
joist by splicing four pieces of lumber
onto the sides of the joist.

When asked by the judge whether the F.H.A. inspector should

have discovered this problem, the engineer responded,

. . . The rotted hardwood was covered by
carpet, wall-to-wall carpet, and I'm sure
the floor would have felt a little soft;
but that would have been a pretty
extensive inspection, to go around [and]
poke your fingers along the walls.

The tile in the bathroom is not
cracked, so there wouldn't have been a
clue in there.

Underneath the house would have been
the only hope of finding this thing, and
even though there was foil paper covering
the plywood, the foil does not cover the

> floor joist, and there was evidence of water stain and mildew on the joist; that would have been enough to at least suspect there was a leakage problem.

Defendant Jim Cassetty estimated the damaged area could be repaired for not more than $800. The plaintiff's expert submitted a bid to repair the damaged portion for $7,000.

The trial court made no specific findings of fact. It ruled as follows:

> The Court is convinced that the Defendants were guilty of unfair or deceptive acts or practices and violated the provisions of T.C.A. § 47-18-104(b)(27). . . .

The Court of Appeals affirmed the conclusion that the defendants Russell and Jim Cassetty were guilty of unfair or deceptive acts. It held that they "engaged in a deceptive act by, either intentionally or negligently, covering over a serious defect in the house." That court concluded, however, that the deceptive act was not the cause of any damages and reversed the judgment entered by the trial court.

**II**

The standard of review is stated in Rule 13(d) of the Tennessee Rules of Appellate Procedure:

> Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise.

When the trial judge has failed to make specific findings of fact, this Court will review the record to determine the preponderance of the evidence. See Kemp v. Thurmond, 521 S.W.2d 806, 808 (Tenn. 1975). Furthermore, "the construction of the statute and application of the law to the facts is a question of law." Beare Co. v. Tennessee Dept of Revenue, 858 S.W.2d 906, 907 (Tenn. 1993). The scope of review for questions of law is de novo upon the record of the chancery court with no presumption of correctness. Union Carbide Corp. v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993).

**III**

Resolution of the issues presented requires a

construction of the Tennessee Consumer Protection Act.  In construing the statute, this Court must ascertain and give effect to the legislative intent and the ordinary meaning of the language of the statute.  Carson Creek Vacation Resorts, Inc. v. Dept. of Revenue, 865 S.W.2d 1, 2 (Tenn. 1993).  Additionally, "[t]he Tennessee Consumer Protection Act is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." Morris v. Mack's Used Cars, 824 S.W.2d 538, 540 (Tenn. 1992); Tenn. Code Ann. § 47-18-102(2) (1995).

The Act was enacted "to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce . . ., [t]o encourage and promote the development of fair consumer practices; [and] . . . [t]o declare and to provide for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce be had in this state . . ."  Tenn. Code Ann. § 47-18-102.

The Act authorizes a private cause of action:

Any person who suffers an ascertainable loss

> of money or property, real, personal, or
> mixed, or any other article, commodity, or
> thing of value wherever situated, as a result
> of the use or employment by another person of
> an unfair or deceptive act or practice
> declared to be unlawful by this part, may
> bring an action individually to recover
> actual damages.

Tenn. Code Ann. § 47-18-109(a)(1) (1995).

This Court has discussed issues under the Act in only three cases. In Morris v. Mack's Used Cars, 824 S.W.2d 538 (Tenn. 1992), the seller sold the purchaser a truck, "as is." The seller knew it was a reconstructed vehicle. Being reconstructed reduced the vehicle's fair market value 30 to 50 percent. The seller's defense was that the disclaimer contained in the bill of sale protected it from liability under the Act. This Court ruled that the Uniform Commercial Code (U.C.C.) imposes an obligation of good faith in the performance of every contract which may not be disclaimed, and that disclaimers permitted by Tenn. Code Ann. § 47-2-316 do not defeat separate causes of action under the Consumer Protection Act. Id. at 539. The court stated:

> To allow the seller here to avoid
> liability for unfair or deceptive acts or
> practices by disclaiming contractual
> warranties under the U.C.C. would
> contravene the broad remedial intent of
> the Consumer Protection Act.

<u>Id.</u> at 540.

In <u>Quality Auto Parts Co. v. Bluff City Buick Co.</u>,
876 S.W.2d 818, 819 (Tenn. 1994), the Court concluded that it
did not need to reach the issue of whether consumer
protection laws apply to disputes arising in the context of
employer-employee relationships.  The Court found that the
alleged false statements about the plaintiff did not
disparage the quality of the plaintiff's services and
therefore would not support a claim under the Act.

In <u>Pursell v. First American National Bank</u>, 937
S.W.2d 838, 839 (Tenn. 1996), the Court found that the
defendant bank's breach of an agreement to return property in
a repossession dispute, did not form the basis of an action
under the Act because the actions of the bank did not affect
the conduct of any "trade or commerce."  The Court noted,

> This holding is confined to the
> facts and circumstances of this case, and
> we do not, by this Opinion, generally
> exempt banking activities from the
> Tennessee Consumer Protection Act.

<u>Id.</u> at 842.

-14-

The Act is applicable to the transaction in this case.  The plaintiff is a consumer as defined in the Act, the purchase of real property is covered by the Act, and the property was offered for sale by a realtor in the course of the real estate trade.  The term "consumer" is defined in the Act, and in pertinent part states, "'Consumer' means any natural person who seeks or acquires by purchase . . . any . . . property . . . . real, personal or mixed . . . ."  Tenn. Code Ann. § 47-18-103(2)(1995).  The Act defines "trade" and "commerce" in pertinent part, as follows: "'Trade,' 'commerce,' or 'consumer transaction' means the . . . offering for sale . . . of any . . . property . . . . real, personal, or mixed . . . ."  Tenn. Code Ann. § 47-18-103(9)(1995).  Consequently, the complaint states a cause of action against the defendant Jim Cassetty.

However, whether the Act is applicable to the sale by the defendant Russell, who is not generally engaged in the sale of real property, is less clear.  Two of the stated purposes of the Act are to maintain "ethical standards of dealing between <u>persons engaged in business</u> and the consuming public," and to protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices <u>in the conduct of any trade or commerce</u>."  Tenn. Code Ann. §§ 47-18-102(2) & (4) (1995) (emphasis added).

Although this language does not explicitly exclude from the Act sellers not in the business of selling property as owners or brokers, a reasonable construction is that they are not included.[3]

Some consumer protection acts found in other jurisdictions, clearly apply only to persons who regularly solicit or engage in consumer transactions.  See e.g. Iadanza v. Mather, 820 F. Supp. 1371, 1381 (D. Utah 1993).  The majority of jurisdictions in which real estate sales are governed by the act, have held that persons making an isolated sale of their home are not covered by the Act.

> A number of state courts have ruled that, even where real estate sales are generally covered, the isolated sale of real estate by a nonmerchant is not covered.  This should be viewed as an attempt to keep consumer-to-consumer sales transactions outside the [unfair and deceptive acts and practices] statute's scope, and not an attempt to exclude all real estate practices from the state's coverage.  In particular, even though a court may dismiss the homeowner as a ... defendant, the case against the homeowner's realtor and termite inspector should go forward.

---

[3]Although the Court later in this opinion relies upon the decision of the District Court in Klotz v. Underwood, 563 F. Supp. 335, 337 (E.D. Tenn. 1982), aff'd, 709 F.2d 1504 (6th Cir. 1983), we reach a different conclusion on this issue.

Jonathan Sheldon, <u>Unfair and Deceptive Acts and Practices</u>, 51 (3d ed. 1991) (footnotes omitted); <u>see</u> <u>Jackson v. Manasquan Sav. Bank</u>, 638 A.2d 165, 170 (N.J. Super. L. 1993); <u>Bhatti v. Buckland</u>, 400 S.E.2d 440, 444 (N.C. 1991) ("Assuming that a 'homeowner's exception' exists, its application is limited to an individual involved in the sale of his or her own residence."); <u>Robertson v. Boyd</u>, 363 S.E.2d 672, 676 (N.C. App. 1988)("private parties engaged in the sale of a residence, were not involved in trade or commerce and cannot be held liable under the statute . . . [realty company and termite inspector] were engaged in trade or commerce within the meaning" of the statute); <u>DiBernardo v. Mosley</u>, 502 A.2d 1166, 1168 (N.J. Super. A.D. 1986) ("the Act was intended as a response only to the public harm resulting from 'the deception, misrepresentation and unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods' . . . and not to the isolated sale of a single family residence by its owner"); <u>Young v. Joyce</u>, 351 A.2d 857, 860 (Del. Supr. 1975)("we do not belive that the isolated sale of real estate by its owner . . . constitutes the conduct of trade or commerce").  The conclusion is that the Act is not applicable to the seller in this case.

The next question is whether the evidence supports

the trial court's conclusion that the defendant Cassetty committed an unfair or deceptive act or practice within the meaning of the Act.  The claim in this case is based on the following provisions of the Act:

> . . . the following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:
>
> (27) Engaging in any other act or practice which is deceptive to the consumer . . . .

Tenn. Code Ann. § 47-18-104(b) (1995).  The Act does not define the terms "unfair" and "deceptive," and the Court has not heretofore defined these terms.

The Act states that in determining the statute's intended meaning the court should look to opinions concerning a similar provision in the Federal Trade Commission Act.[4] Tenn. Code Ann. § 47-18-115 (1995).  The federal courts have noted that the terms "unfair" and "deceptive" are incapable of close definition:

> It is important to note the generality of

---

[4] See 15 U.S.C. §45(a)(1)(1973)("Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.").

> these standards of illegality; the
> proscriptions in §5 are flexible, "to be
> defined with particularity by the myriad
> of cases from the field of business."

Federal Trade Comm. v. Colgate-Palmolive Co., 380 U.S. 374,
384-85, 85 S. Ct. 1035, 1042, 13 L. Ed. 904(1965) (quoting
Federal Trade Comm. v. Motion Picture Advertising Service
Co., 344 U.S. 392, 394, 73 S. Ct. 361, 363, 97 L. Ed. 426
(1953)).  Without limiting the broad scope of the Act, the
following definitions found in decisions from other
jurisdictions clearly are applicable to this case.  The
Supreme Court of Vermont has held that "a 'deceptive act or
practice' is a material representation, practice or omission
likely to mislead a reasonable consumer."  Bisson v. Ward,
628 A.2d 1256, 1261 (Vt. 1993).  A similar definition is
found in Connor v. Merrill Lynch Realty, Inc., 581 N.E.2d
196, 202 (Ill. App. 1991):  "a deceptive practice is the
concealment, suppression or omission of any material fact,
with intent that others rely upon the concealment,
suppression or omission of such material fact."

In Klotz v. Underwood, 563 F. Supp. 335 (E.D. Tenn.
1982), aff'd, 709 F.2d 1504 (6th Cir. 1983), the subject of
the sale was an old house to which later additions had been
made.  Subsequent to the sale, the purchasers discovered, by

removing a portion of a wall, water damage to members and appurtenances of the house. The District Court held that the Tennessee Consumer Protection Act imposes no liability where the seller had no knowledge of the hidden defects and where an inspection by the purchaser would reveal the same information known by the seller.

Brokers, agents and other professional sellers of real property have knowledge and information superior both in quantity and quality to that of an average residential purchaser regarding factors and conditions that affect the value of the property they are offering for sale. They are obligated by the Act to exercise good faith in disclosing to prospective purchasers material facts affecting the value of the property known to them and not known to or reasonably ascertainable by a prospective purchaser. The extent of this duty, however, will be determined by the facts and circumstances of each situation, including the property and the parties, and the generally accepted professional standards in the trade. The Act does not impose strict liability. Nor does it impose upon realtors duties beyond those which are generally accepted in the business as good practice. The provisions of Tenn. Code Ann. §§ 66-5-201 to 66-5-210 (Supp. 1996) (residential property disclosures), though not determinative, may be relevant in cases arising

after its enactment in 1994. Likewise, the provisions of the Real Estate Brokers License Act, Tenn. Code Ann. §§ 62-13-101 to 62-13-322 (1990 & Supp. 1996), may also be relevant in determining good practice.

Tested by this standard, the evidence does not show that the defendant realtor is guilty of unfair or deceptive acts. The realtor undertook to bring the house within F.H.A. requirements. Other small deficiencies noted by the F.H.A. inspector were repaired. When advised by the termite inspector of the damage under the bathroom, the realtor engaged a carpenter and instructed him, with the owner's approval, to repair the damage found. This repair was made known to the purchaser's agent, although she apparently took little note of it. None of the parties were aware that the water damage had extended to the dining area. That damage was not noted by the F.H.A. inspector or the independent appraiser, both of whom inspected the premises. Even the expert employed by the plaintiff testified that finding the damage would have required one to "poke your fingers along the walls," and that there was no "clue" to the damage in the bathroom. He stated that only under the house was there enough indication to suspect a leakage problem. The damage was essentially hidden from all inspections except that which occurred after the sale with the removal of the floor

covering in the affected area.  Apparently, none of the several persons whose professional duty was to examine the premises felt that removal of the carpeting was appropriate. Those persons included the F.H.A. inspector, the independent appraiser, the termite inspector, and three realtors.

The conclusion is that the evidence preponderates against the finding that the defendant Cassetty is guilty of an unfair or deceptive act within the meaning of the Act.

For these reasons, the judgment of the Court of Appeals reversing the trial court is affirmed and the case is remanded to the Circuit Court of Sumner County.

Costs on appeal are taxed to the plaintiff.

_____
REID, J.

Concur:

Birch, C.J., and Drowota, J.