IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 3, 2009 Session

ROBIN LEE STANFILL ET AL. V. JOHN T. MOUNTAIN ET AL.

Appeal by Permission from the Court of Appeals, Middle Section
Circuit Court for Maury County
No. 10862     Stella L. Hargrove, Judge

No. M2006-01072-SC-R11-CV - Filed December 3, 2009

The buyers of real property brought this action against the sellers and the real estate agent after discovering numerous allegedly dangerous and defective conditions in the house and on the property. The issue in this case is the propriety of the trial court's grant of summary judgment to the defendants. After review, we conclude that there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law on the plaintiffs' claims regarding the alleged mold infestation of the house, and that Mrs. Mountain is entitled to summary judgment on the plaintiffs' claim regarding the underground fuel storage tanks. As to the remainder of the plaintiffs' claims, we conclude that summary judgment was improper because the plaintiffs met their burden in establishing the existence of several genuine issues of material fact. We affirm in part and reverse in part the trial court's judgment and remand for further proceedings.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part; Case Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined. JANICE M. HOLDER, C.J., filed a separate opinion concurring in part and dissenting in part.

John E. Herbison, Nashville, Tennessee, for the appellants, Robin Lee Stanfill and Robyn Ann Stanfill.

Scott C. Williams and Rhonda A. Scott, Nashville, Tennessee, for the appellees, John T. Mountain and Melony Mountain.

David A. Bates and C. Nicholas Fossett, Columbia, Tennessee, for the appellee, Carl Brooks.

**OPINION**

## I. Background and Procedural History

On June 19, 1999, the Defendants, John T. Mountain and Melony Mountain, entered into an agreement for the sale of their real property in Maury County, Tennessee, to the Plaintiffs, Robin Lee Stanfill and Robyn Ann Stanfill. Prior to closing, the Mountains completed a residential property condition disclosure form indicating that they were not aware of any significant defects or malfunctions in the house. Defendant Carl Brooks, a realtor, worked for the Mountains in the transaction, but also testified that he served as a facilitator.[1] The sale closed on August 2, 1999.

The Plaintiffs alleged that Mrs. Stanfill and their two young daughters began experiencing health problems shortly after moving into the house. The children suffered frequent high fevers, diarrhea, and vomiting. Following numerous trips to the doctor, the children were tested for lead poisoning in the spring of 2000, and the results indicated a high level of lead in their bodies. The Stanfills also allegedly discovered defects in the house, including mold contamination and structural problems, as well as defects in the septic system. The Stanfills had the house tested by an environmental firm, and the results revealed the presence of lead-based paint and a toxic mold infestation in the house. The Stanfills also discovered old underground fuel storage tanks located approximately fifteen feet from a well that the Stanfills used for their swimming pool, irrigation, and other outside uses on the farm. Subsequent testing of the well water revealed that it was contaminated with unacceptably high levels of lead and several other metals.

In February of 2001, the Stanfills filed for bankruptcy. In May of 2001, they moved out of

---

[1] A "facilitator" is defined in Tennessee Code Annotated section 62-13-102(9) (Supp. 2008) as any real estate licensee:

> (A) Who assists one (1) or more parties to a transaction who has not entered into a specific written agency agreement representing one (1) or more of the parties; or
>
> (B) Whose specific written agency agreement provides that if the licensee or someone associated with the licensee also represents another party to the same transaction, such licensee shall be deemed to be a facilitator and not a dual agent; provided, that notice of assumption of facilitator status is provided to the buyer and seller immediately upon such assumption of facilitator status, to be confirmed in writing prior to execution of the contract. A facilitator may advise either or both of the parties to a transaction but cannot be considered a representative or advocate of either party. "Transaction broker" may be used synonymously with, or in lieu of, "facilitator" as used in any disclosures, forms or agreements under this chapter[.]

the house.  On June 14, 2004,[2] the Stanfills filed this action alleging intentional and/or negligent misrepresentation by the Defendants, in that they allegedly knew of the defects in the property, including the underground fuel storage tanks, and concealed or misrepresented the true condition of the property on the residential property condition disclosure form and in discussions prior to the sale. The Stanfills also alleged that the Defendants violated the Tennessee Consumer Protection Act ("TCPA") and failed to provide the Stanfills a lead disclosure statement or lead hazard information pamphlet as required by 42 U.S.C. § 4852d.

All the Defendants moved for summary judgment.  In support of his summary judgment motion, Mr. Brooks filed his affidavit, copies of the Tennessee Residential Property Condition Disclosure and Lead Paint Disclosure forms, the report of the results from the environmental testing of the well water, and excerpts from the depositions of Dr. Roy Dallas Crowder and Mrs. Stanfill. In support of their summary judgment motion, the Mountains filed their affidavits, the property condition and lead paint disclosure documents and well water test results, and the depositions of Dr. Crowder and of Mr. and Mrs. Stanfill.

In response, the Stanfills filed their depositions, the depositions of several of the Mountains' neighbors, the deposition of geologist Christopher Ian Barrett, the affidavit of geologist Mark Quarles, and portions of the depositions of Mr. Brooks and Dr. Crowder to support their assertion that genuine issues of material fact precluded summary judgment.  The trial court entered an order and memorandum opinion on April 18, 2006, granting summary judgment in favor of the Defendants on all of the Stanfills' claims.  The Court of Appeals affirmed the trial court's judgment.  Stanfill v. Mountain, No. M2006-01072-COA-R3-CV, 2008 WL 427281 (Tenn. Ct. App. Feb. 12, 2008). We granted the Plaintiffs' application for permission to appeal to review the grant of summary judgment in favor of the Defendants.[3]

## II.  Analysis

### A.  Summary Judgment Standard

Summary judgment is appropriate only when the moving party can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Tenn. R.

---

[2] The Plaintiffs originally filed suit against the Defendants on March 18, 2003.  An order of nonsuit was entered on June 16, 2003.  The case was refiled within one year of the nonsuit pursuant to Tennessee Code Annotated section 28-1-105 (2000).

[3] The Stanfills have presented no argument, citation to proof in the record, or citation to legal authority in their brief regarding the trial court's summary judgment on their claims regarding defective interior walls, ceiling, plumbing, sewer/septic, electrical system and basement, and therefore the propriety of the trial court's summary judgment on these claims is not at issue on this appeal.

Civ. P. 56.04; <u>Hannan v. Alltel Publ'g Co.</u>, 270 S.W.3d 1, 5 (Tenn. 2008); <u>Byrd v. Hall</u>, 847 S.W.2d 208, 214 (Tenn. 1993). In <u>Hannan</u>, this Court reaffirmed the basic principles guiding Tennessee courts in determining whether a motion for summary judgment should be granted, stating:

> The moving party has the ultimate burden of persuading the court that "there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." <u>Byrd</u>, 847 S.W.2d at 215. If the moving party makes a properly supported motion, the burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists. <u>Id.</u>
>
> . . .
>
> [I]n Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.

<u>Hannan,</u> 270 S.W.3d at 5, 8-9. It is insufficient for the moving party to "merely point to omissions in the nonmoving party's proof and allege that the nonmoving party cannot prove the element at trial." <u>Id.</u> at 10. "Similarly, the presentation of evidence that raises doubts about the nonmoving party's ability to prove his or her claim is also insufficient." <u>Martin v. Norfolk S. Ry. Co.</u>, 271 S.W.3d 76, 84 (Tenn. 2008).

The standard by which our courts must assess the evidence presented in support of, and in opposition to, a motion for summary judgment is also well established:

> Courts must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. <u>Robinson v. Omer</u>, 952 S.W.2d 423, 426 (Tenn. 1997). A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion. <u>Staples v. CBL & Assocs., Inc.</u>, 15 S.W.3d 83, 89 (Tenn. 2000). In making that assessment, this Court must discard all countervailing evidence. <u>Byrd</u>, 847 S.W.2d at 210-11.

<u>Giggers v. Memphis Housing Auth.</u>, 277 S.W.3d 359, 364 (Tenn. 2009). "Because the resolution of a motion for summary judgment is a matter of law, we review the trial court's judgment de novo with no presumption of correctness." <u>Martin</u>, 271 S.W.3d at 84.

Applying these principles to the evidence presented by the parties in this case, we address each issue in turn.

4

## B. Fraudulent Concealment Claims

The Stanfills' claims regarding the mold infestation and underground fuel storage tanks[4] are grounded in the theory of fraudulent concealment. This Court has observed that "[t]he tort of fraudulent concealment is committed when a party who has a duty to disclose a *known fact or condition* fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." Chrisman v. Hill Home Dev., Inc., 978 S.W.2d 535, 538-39 (Tenn. 1998) (emphasis added); accord Simmons v. Evans, 206 S.W.2d 295, 296 (Tenn. 1947). The Chrisman Court recognized that "an essential element of the tort" is *knowledge* – in the case of a house sale, the buyer must show, among other things, that the seller had knowledge of the defective condition. Chrisman, 978 S.W.2d at 539.

Both Mr. Brooks and the Mountains presented evidence that negated the element of knowledge regarding the mold infestation of the house, thus shifting the burden to the Stanfills to respond with evidence creating a genuine issue of material fact on the mold claims, which the Stanfills failed to do in this case. Regarding the claim that the Defendants fraudulently concealed the existence of the old underground storage tanks, both Mr. Brooks and the Mountains again presented evidence that negated the element of knowledge, thus shifting the burden to the Stanfills to respond with evidence creating a genuine issue of material fact. The Stanfills presented evidence that successfully creates a genuine issue of material fact as to whether Mr. Mountain had knowledge of the tanks, but the evidence was insufficient to create a genuine issue of material fact regarding whether Mrs. Mountain and Mr. Brooks knew of the tanks.

### 1. Mold Infestation of the House

To support his motion for summary judgment, Mr. Brooks filed a sworn affidavit stating as follows: "[a]t the time of sale, I had no actual knowledge of the presence of any type of mold in the residence or any of the other buildings located on the property." In response, the Stanfills admitted that it was undisputed that Mr. Brooks had no actual knowledge of the presence of mold in the residence at the time of sale. Therefore, the trial court was correct in granting summary judgment to Mr. Brooks on this issue. See Robinson v. Currey, 153 S.W.3d 32, 38 (Tenn. Ct. App. 2004) (affirming summary judgment where the "Defendants affirmatively negated an essential element of Plaintiffs' claim, that the alleged 'material defects [mold and water damage] [were] known to the

---

[4] As further discussed below, the Stanfills' claims regarding the underground fuel storage tanks also sound in misrepresentation, as they alleged that the Defendants intentionally or negligently misrepresented that they did not know of the existence of the underground tanks on their Tennessee Residential Property Condition Disclosure form provided to the Stanfills.

owner'") (second set of brackets in original) (quoting Tenn. Code Ann. § 66-5-202 (2003).

To support their motion for summary judgment, Mr. and Mrs. Mountain each filed a sworn affidavit stating the following: "[a]t the time of sale, I had no actual knowledge of the presence of any type of mold in the residence or any of the other buildings located on the property." The Mountains' testimony effectively negated the element of knowledge, shifting the burden to the Stanfills to provide evidence creating a genuine issue of material fact on their fraudulent concealment of the mold claim. The Stanfills relied on the deposition testimony of Mrs. Stanfill and the environmental test results report indicating a toxic mold infestation in the house. Mrs. Stanfill testified in her deposition that after they moved into the house, "we started noticing black spots coming up out of the ceiling, and it was in the ceiling in the bathrooms and in the laundry room." Mrs. Stanfill testified that it was "a few months" after they had been in the house that they started noticing the black spots, and that "I had never noticed them before, not before we bought the home. They had just started coming up out of the ceiling, coming through the paint."

The Stanfills did not provide sufficient evidence to contradict the Mountains' assertion that they were unaware of mold in the house or to create a genuine issue of material fact as to whether the Mountains knew of the existence of mold in the residence. As noted, Mrs. Stanfill testified that they did not observe the black spots of mold on the ceiling until several months after they moved in. There is no evidence that the black mold spots were present or visible at or before the time of sale of the residence. Mrs. Stanfill stated in her deposition that she didn't know whether the Mountains knew there was a mold problem in the house, and that when the Stanfills "were talking with the neighbors about the issues with the house," none of the neighbors mentioned that there had been a mold problem in the house. When asked whether there was "any evidence that [the Mountains] were trying to conceal the presence of mold," Mrs. Stanfill replied, "not that I know of." Finally, Mrs. Stanfill testified further as follows:

> Q: I think you also said that the actual presence of mold in the house was not something you felt like Mr. and Mrs. Mountain knew about at the time y'all contracted for the sale?
>
> A: The mold being visible?
>
> Q: Right.
>
> A: No.

As is evident from the above, the Stanfills offered no facts, merely allegations, supporting their contention that the Mountains fraudulently concealed the mold. The evidence in the record is insufficient to create a genuine issue of material fact regarding whether the Mountains knew of the presence of mold in the house. Therefore, the trial court was correct in granting the Mountains summary judgment on the claim of fraudulent concealment of the toxic mold infestation, because the Mountains, by their affidavit testimony, successfully negated the essential element of knowledge

of the alleged defect at the time of sale.

## 2. Underground Fuel Storage Tanks on the Property

The Stanfills alleged that the Mountains knew of and failed to disclose the existence of the underground fuel storage tanks in close proximity to their well. In support of their motion for summary judgment, the Mountains again attacked the element of knowledge, relying upon their identical affidavits, in which they each stated that "[a]t the time of sale, I had no actual knowledge of the presence of underground storage tanks on the property." In response to the question on the Tennessee Residential Property Condition Disclosure form "ARE YOU (SELLER) AWARE OF ANY OF THE FOLLOWING? – Substances, materials, or products which may be an environmental hazard such as, but not limited to: asbestos, radon gas, lead-based paint, fuel or chemical storage tanks, and/or contaminated soil or water on the property," the Mountains checked the box "UNKNOWN."

To meet their burden of establishing a genuine issue of material fact, the Stanfills produced the deposition testimony of two of the Mountains' neighbors, who stated that Mr. Mountain knew and told them of the underground storage tanks. John McGlasson, the Mountains' next-door neighbor, testified as follows:

> John [Mountain] and I were standing out talking in his driveway one day and he asked me if I had seen his well house, and I said, "No, I didn't know you had one." So we started walking over there, and as we were walking in that direction, there was a concrete block, I don't know, maybe a foot square, maybe bigger, with a pipe sticking up out of it. And I kind of tapped it with my foot, and I said, "Is this part of it?" And John replied, "No, that's some old tanks."

Similarly, Perry Sanford Bodine, another neighbor, testified that Mr. Mountain told him on two occasions that there was an old tank in the ground. Mr. Bodine stated colorfully that he "would swear it on ten Bibles" that John Mountain knew there were tanks in the ground. Thus, in this case there is a genuine issue of material fact as to whether Mr. Mountain knew the underground storage tanks were on his property at the time of sale, and whether the statement on the Tennessee Residential Property Condition Disclosure form that it was "unknown" whether he was aware of "fuel or chemical storage tanks" was falsely made. Accordingly, summary judgment in Mr. Mountain's favor was inappropriate.

However, the Stanfills did not produce sufficient evidence[5] suggesting that Mrs. Mountain knew of the existence of the underground tanks. Mr. Bodine stated, "I don't have knowledge of Melony [Mountain] knowing about the tank, I've never discussed that with her." Thus, the trial court correctly granted summary judgment in Mrs. Mountain's favor on this issue.

To support his motion for summary judgment on the claims of fraudulent concealment of the underground storage tanks, Mr. Brooks testified in his affidavit that he had no knowledge of the underground storage tanks at the time of sale, thus effectively negating the knowledge element of the claim and shifting the burden to the Stanfills to provide or identify evidence creating a genuine issue of material fact. The Stanfills produced no evidence, circumstantial or otherwise, demonstrating or raising a reasonable inference that Mr. Brooks actually knew of the underground tanks prior to closing. Thus, the trial court correctly granted summary judgment in favor of Mr. Brooks on the Plaintiffs' claim of fraudulent concealment of the underground fuel storage tanks.

## C. Misrepresentation Claims

The Stanfills also alleged that the Mountains intentionally or negligently misrepresented that they had no knowledge of the underground storage tanks on the Tennessee Residential Property Condition Disclosure form. A claim for intentional misrepresentation has the following six elements:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008). The Mountains' arguments attack element (2), denying knowledge of the underground tanks on the property, and arguing that their statement on the Tennessee Residential Property Condition Disclosure form that they had no knowledge of the tanks was therefore true, and element (6), asserting that the misrepresentation did not cause damages to the Stanfills. We address the arguments regarding these two elements of intentional misrepresentation in turn.

---

[5] We recognize that it is potentially arguable that the facts that Mrs. Mountain lived on the property for years, that the vent pipe was visible, and that Mr. Mountain allegedly spoke of the underground tanks and the vent pipe with his neighbors, provide some circumstantial evidence that Mrs. Mountain may have learned of the existence of the tanks from her husband. But the Stanfills have not alleged nor argued that Mr. Stanfill's knowledge should be imputed to Mrs. Stanfill, and in the face of her sworn denial by affidavit, we do not believe it is a reasonable inference under these circumstances to presume that Mrs. Stanfill knew of the existence of the underground tanks simply because her husband allegedly did.

Regarding the element requiring the plaintiff to demonstrate that the representation was false when made, the Mountains rely on the same evidence as discussed at length in section II(B) above: their sworn denials by affidavit that they had any actual knowledge of the underground tanks at the time of sale. The only alleged misrepresentation by the Mountains in this case is the Mountains' response to the question on the Tennessee Residential Property Condition Disclosure form "ARE YOU (SELLER) AWARE OF ANY OF THE FOLLOWING? – Substances, materials, or products which may be an environmental hazard such as, but not limited to: asbestos, radon gas, lead-based paint, fuel or chemical storage tanks, and/or contaminated soil or water on the property," where the Mountains checked the box "UNKNOWN." The Mountains argue that because they had no knowledge of the existence of the tanks at the time of sale, this representation was true, and thus the Stanfills cannot demonstrate a required element of their misrepresentation claim – falsity of the statement.

The analysis of the "falsity" element of the Stanfills' intentional misrepresentation claim is the same as in the discussion regarding the "knowledge" element of fraudulent concealment above. As thoroughly discussed above, the Mountains and Mr. Brooks testified by affidavit that they had no knowledge of the existence of the underground fuel storage tanks at the time of sale, thus negating the element of falsity of the alleged misrepresentation. The burden thereby shifted to the Stanfills to provide evidence creating a genuine issue of material fact on whether the Defendants actually did have knowledge of the tanks' existence at the time of sale. As noted, the Stanfills failed to meet this burden with regard to Mrs. Mountain, but successfully provided evidence creating a genuine factual issue regarding Mr. Mountain's knowledge. Thus, summary judgment in Mrs. Mountain's favor was appropriate, but the trial court erred in granting Mr. Mountain summary judgment on the Stanfills' misrepresentation claims.

The Stanfills' claim against Mr. Brooks is based upon another alleged misrepresentation. The only visible evidence of the underground storage tanks on the property was an old vent pipe coming out of a small square concrete pad in the ground. Mr. Stanfill testified that while Mr. Brooks was showing him the property, Mr. Stanfill asked him what the vent pipe was, and Mr. Brooks told him it was part of an old dairy operation that had once been on the property. The Stanfills allege that Mr. Brooks' statement that the vent pipe was just "part of the dairy operations" was an intentional or negligent misrepresentation. To succeed on a negligent misrepresentation claim, a plaintiff must establish that: (1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiffs justifiably relied on the information. Walker, 249 S.W.3d at 311 (quoting Williams v. Berube & Assocs., 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)).

Mr. Brooks' argument attacks element (1) of the claims for both intentional and negligent misrepresentation. In short, Mr. Brooks testified in his deposition that the alleged conversation between him and Mr. Stanfill regarding the vent pipe never occurred. Thus, as regards the intentional misrepresentation claim, Mr. Brooks argues that the Stanfills cannot prove element (1): that he made the allegedly false representation of an existing or past fact. Regarding the negligent

9

misrepresentation claim, Mr. Brooks argues that the Stanfills cannot prove that he supplied Mr. Stanfill the information that forms the basis of the misrepresentation claim. Mr. Brooks' deposition testimony does not tend to disprove Mr. Stanfill's factual assertion regarding the conversation about the vent pipe; it merely creates a genuine issue of material fact by casting doubt on Mr. Stanfill's factual assertion. Mr. Brooks, therefore, did not shift his summary judgment burden, and thus summary judgment was inappropriate on the Stanfills' intentional and negligent misrepresentation claims against Mr. Brooks.

We now turn to the Defendants' argument that their proffered evidence negated the element of causation. The great majority of the evidence in the record, and the attention of the courts below, focuses on the question of whether the Stanfills have established the existence of a genuine issue of material fact regarding whether the contamination of the well water with elevated levels of lead and other metals was caused by the presence and proximity of the underground storage tanks. We conclude that the expert testimony presented, examined in the light most favorable to the Stanfills, raises a genuine issue of material fact.

To support their motions for summary judgment, both the Mountains and Mr. Brooks presented and relied on the deposition testimony of Dr. Roy Dallas Crowder, a chemist and environmental specialist working for the Tennessee Department of Environment and Conservation. Dr. Crowder reviewed and analyzed the test results of the well water on the property. Dr. Crowder testified that the level of extractable petroleum hydrocarbons (EPH) in the water was .286 millimeters per liter, well above the .1 threshold of concern for drinking water, but below the 1.0 threshold of concern for nondrinking water. Dr. Crowder testified that the elevated level of EPH suggested "a possibility of – not an absolute fact of petroleum contamination, but a possibility." Dr. Crowder explained that there are naturally occurring sources of EPH other than petroleum contamination. Dr. Crowder testified that the absence of other petroleum-related compounds in the sample caused him to rule out petroleum as a contaminant, stating, "[b]ut then you go down there and you look at them, at the compounds that are in the extractable organics, and none of them are petroleum." Dr. Crowder further testified regarding his analysis as follows:

> In the case of Gasoline Range Organics, there's a – of which there was none detected here – you can go to the volatile analysis and you can look for typical volatile compounds that you'll see in gasoline and you can look for, again: benzene, toluene, ethyl benzene and xylene, which is called a BTEX; that's actually another analysis that is petroleum oriented. You can perform a BTEX analysis for those four compounds and you will find those present for gasoline. . . . None of those were detected. There are other compounds that are quite typical of gasoline, there's methyl tertiary butyl ether, if it's a later, it's a more recent production. Naphthalene is something that's common in gasoline. In fact, naphthalene is used as a marker compound for the UST [underground storage tank] contamination. But there was nothing detected. There are a mixture of benzene isomers, 1,2,4 and 1,3,5

10

trimethylbenzene, is very characteristic of gasoline, but none of these were detected at all. And when I reviewed that aspect of it, I said, "Well, there's no gasoline contamination of this water."

Dr. Crowder concluded with his opinion that he was "100 percent sure there's no petroleum contamination in that water sample."

Dr. Crowder's above-cited testimony effectively shifted the burden of production to the nonmoving parties, the Stanfills, by affirmatively negating an essential element of their claim for lead poisoning from the well water – causation. The burden of production then shifted to the Stanfills to show that a genuine issue of material fact exists on the causation issue in order to avoid summary judgment, which the Stanfills did by pointing to the affidavit testimony of geologist Mark Quarles, geologist Christopher Ian Barrett, and other parts of Dr. Crowder's deposition.

Mr. Quarles testified in his affidavit as follows:

I am a Registered Professional Geologist . . . with 16 years experience conducting environmental investigations relative to release of contaminants, including petroleum hydrocarbons, to the environment. . . . I have conducted an investigation into the presence of lead and petroleum constituents in a drinking water well[6] on the former property owned by Mr. Robin Stanfill[.]

. . .

Dr. Crowder's interpretation of the September 19, 2002 well water sample and his statement that "there's no indication here of any petroleum contamination" because volatile organic compounds (VOCs) and semi-volatile organic compounds (SVOCs) were not present in the sample, does not guarantee that the lead in the groundwater was not from a petroleum release. *There is more evidence to conclude that the lead originated from a release of leaded gasoline or diesel fuel than from phosphate mining.*[7] Lead was an added component of gasoline and was also present as a trace metal in diesel fuel. Further, of the six metals that were present in the water sample (barium, chromium, copper, lead, nickel, and zinc), all of the metals have been determined to be present in one or more of the following: crude oil, regular gasoline, diesel fuel, and gasoline/water mixtures obtained from leaking UST [underground storage tank] sites in the United States.

---

[6] We note that there is no evidence the Stanfills ever used the well for drinking water. The proof is that they used the water to fill their in-ground swimming pool, for irrigation, and other outside farm uses.

[7] Dr. Crowder hypothesized that the contamination of the water with lead and other metals was possibly due to the history of phosphate mining in the area.

11

. . .

Dr. Crowder acknowledged that petroleum hydrocarbons are biodegradable but apparently did not believe that biological processes were the reason that VOCs and SVOCs were not present in the sample collected on September 19, 2002. For a very old release of petroleum hydrocarbons that is in an area of a high groundwater flow rate, it is possible that VOCs and SVOCs would experience biodegradation and dilution because of the potential age of the release and the high flow rates of carbonate (limestone) aquifers. Therefore, biodegradation could in part, explain the absence of VOCs and SVOCs in the sample. . . . Also, lead does not undergo biodegradation. Therefore, it is possible for lead to be present in the soil in the immediate area of an old leaded petroleum release, even though petroleum hydrocarbons are not observed in the same sample.

(Emphasis added). Mr. Quarles' theory, that a very old petroleum release from the underground tanks would continue to yield high lead concentrations but would not yield other chemical signs such as VOCs and SVOCs because of biodegradation over time, is supported by Dr. Crowder's testimony. Dr. Crowder testified that "Mother Nature will eventually consume hydrocarbons; bacteria will." Dr. Crowder further testified that

[i]f it were gasoline forty years ago, you would probably find some elevated lead because the gasoline would have been leaded. *The probabilities of you finding any gasoline components in the soil at forty years is minuscule.* At twenty years, very low, but probable. At ten years and less, you'll see it.

(Emphasis added).

Christopher Ian Barrett, a geologist also employed by the Tennessee Department of Environment and Conservation, testified in his deposition that "these tanks could have been over fifty years old and the contamination could have gotten down to ground water at ninety feet in depth." Mr. Barrett testified that he did not know how old the tanks were or the last time they held petroleum, but that the tanks could have been placed in the ground in "possibly the [19]30s," and that his "best guess" was that the tanks were placed in the ground "somewhere around the World War II time." Thus, viewing the expert testimony in the light most favorable to the Stanfills, and drawing reasonable inferences therefrom in their favor, we believe a reasonable trier of fact could conclude that the contamination of the well water by elevated lead levels was caused by a very old release of leaded petroleum from the underground fuel storage tanks.

Furthermore, even if we did not disagree with the lower courts' conclusion that the Stanfills' evidence was insufficient to create a genuine issue of material fact as to whether the contamination of the well water was caused by the underground storage tanks ("USTs"), summary judgment would

12

still have been improper on the Stanfills' claim for other damages resulting from the concealment or nondisclosure of the existence of the USTs.  As already noted, the Stanfills have produced testimony of the Mountains' neighbors from which a reasonable trier of fact could conclude that Mr. Mountain knew of the existence of the USTs.  The presence of the old USTs on the property created a significant financial and environmental liability and reduced the property value, as noted by Mr. Barrett, who testified that "[a]nybody who purchased this property knowing there was an environmental risk, opened themselves up to a lot of money having to be spent to make the State approve the site for any future sale."  The cost estimates given to Mr. Stanfill by an environmental contractor were in the range of $5,000 – $7,000 for UST removal; $8,000 – $14,000 for well abandonment and installation; and $50,000 – $350,000 for groundwater remediation.  Mr. Barrett testified that he thought these cost estimates were reasonable.  Thus, even if the Stanfills are ultimately unsuccessful on their claim for damages resulting from the well water contamination, a reasonable trier of fact could still conclude that they suffered financial damages that were caused by the nondisclosure of the existence of the USTs.  Accordingly, summary judgment was inappropriate on the Stanfills' claims regarding the USTs.

The Stanfills alleged that the lead-based paint in the house and/or the dangerously elevated lead levels in their well water caused their daughters' lead poisoning.  The trial court found that "[t]here is no proof as to damages caused by lead-based paint.  Therefore, claims of misrepresentations regarding the Lead-Based Paint Disclosure form are immaterial."  We do not agree.  Although the Defendants vehemently disputed causation regarding the elevated lead levels in the well water, they did not present any evidence negating causation regarding the lead paint found in the house, nor did they present a lack of causation argument regarding the lead-based paint in the house.  The Defendants presented neither argument nor evidence tending to negate the element of damages as regards the lead paint in the house.  Thus, the trial court had no basis to grant summary judgment on either causation or damages as regards the Stanfills' lead paint claims.  Regarding the elevated levels of lead in the well water, Dr. Crowder testified that "[i]f someone were continuously exposed to it [the well water], *if they swam in it, swallowed it occasionally* or something of that nature, I wouldn't doubt that it could contribute" to elevated blood-lead levels. (Emphasis added).

Furthermore, the Stanfills presented evidence of significant damages resulting from the elevated blood-lead levels and lead poisoning of their children.  The Stanfills alleged, among other things, that their younger daughter, who was approximately 18 months old in the summer of 2000, required hospitalization and treatment for anemia caused by the lead poisoning.  The potential for serious injury to young children from lead poisoning is indicated by the Lead Warning Statement required by 42 U.S.C. § 4852d(a)(3), which provides, among other things, that "[l]ead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory."  In addition to the alleged damages to the Stanfills' health, the cost estimate range for lead paint removal and renovation was $7,000 to $20,000.

The environmental testing of the house revealed the presence of lead-based paint.  At the

13

summary judgment stage, the Stanfills, as nonmovants, are entitled to all reasonable inferences from the evidence in their favor. Accordingly, the Stanfills are entitled to the entirely reasonable inference that the presence of lead-based paint in the house caused or significantly contributed to the lead poisoning of their children. Summary judgment was therefore inappropriate on the Stanfills' claim related to the hazardous defect of lead-based paint in the house.

### D. Residential Lead-Based Paint Hazard Reduction Act Claims

The Stanfills alleged that at closing, the Mountains and Mr. Brooks failed to provide the Stanfills with a lead hazard information pamphlet and a lead warning statement pursuant to 42 U.S.C. § 4852d, the Residential Lead-Based Paint Hazard Reduction Act ("RLPHRA"). This federal statute requires that the seller of a house built before 1978[8] must provide the buyer a lead hazard information pamphlet, disclose the presence of any known lead-based paint hazard in the house, permit the buyer to conduct a risk assessment or inspection for lead-based paint hazards, and provide the buyer a Lead Warning statement. 42 U.S.C. § 4852d(a)(1) & (2). The RLPHRA further requires a real estate agent who has contracted with a seller to "ensure compliance with the requirements of this section," 42 U.S.C. § 4852d(a)(4), and creates a private civil cause of action for violation of the Act. 42 U.S.C. § 4852d(b).

The Mountains moved for summary judgment and in support thereof testified by affidavit that they "executed a Tennessee Residual [sic: Residential] Property Disclosure and a Lead-Based Paint Disclosure, for delivery to the Plaintiffs." They also filed a Tennessee Residential Property Disclosure and a Lead Paint Disclosure form. The Lead Paint Disclosure form contains the warning statement required by 42 U.S.C. § 4852d and a "seller's disclosure" section indicating that the "[s]eller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing." Below the seller's disclosure section is a "purchaser's acknowledgment" section with three statements, each beside a blank for the purchaser to initial. The blanks beside the statements "Purchaser has received copies of all information listed above" and "Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*" are empty. Beside the statement "Purchaser has (check one below): . . .Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards" are the initials "RAS."

Mr. Brooks, in support of his motion for summary judgment on the Stanfills' RLPHRA claim, similarly relied on the Tennessee Residential Property Disclosure and Lead Paint Disclosure forms.

A close inspection of the evidence presented and relied upon by the Defendants reveals that

---

[8] The house at issue here was constructed before 1978.

they did not successfully negate an element of the Stanfills' lead paint disclosure RLPHRA claim. The Stanfills alleged and testified that they were not provided the required lead paint disclosure information at closing. Although the Defendants' presentation of the proof and arguments are carefully crafted to create the inference that they provided the lead hazard information pamphlet and Lead Warning statement, none of the Defendants testified that they actually did provide the documents at or prior to closing. The Mountains testified only that they "executed a . . . Lead-Based Paint Disclosure, for delivery to the Plaintiffs," not that there was an actual delivery. The record contains no testimony of Mr. Brooks, either by affidavit or deposition, pertaining to the required lead disclosure forms. The evidence presented in the record is insufficient to negate an element of the Stanfills' RLPHRA claim, and therefore the trial court erred in granting the Defendants summary judgment on this claim.

Moreover, had we found that the Defendants shifted their burden, summary judgment would still be inappropriate because the Stanfills identified in the record genuine issues of material fact on this claim. Specifically, both Mr. and Mrs. Stanfill testified that the Defendants did not provide them with the lead-based paint hazard documents required by the RLPHRA, and Mrs. Stanfill testified that the initials on the Lead Paint Disclosure form waiving the right to have the property inspected were not hers. Additionally, the real estate sale contract executed by the parties contains a provision that states "**ATTACHMENTS**: The following forms have been executed and are attached to this Contract." The box beside "Lead Base Paint Disclosure - Homes built prior to 1978" is unchecked. This conflicting evidence creates a genuine issue of material fact as to whether the Defendants provided the Stanfills with the required lead disclosure and warning statements. Accordingly, summary judgment was not appropriate on this issue.

### E. Tennessee Consumer Protection Act Claims

The Stanfills alleged that the Mountains and Mr. Brooks violated the Tennessee Consumer Protection Act of 1977 ("TCPA"), Tenn. Code Ann. § 47-18-101-125 (2001), for unfair or deceptive acts or practices in concealing the defects in the property, including the underground fuel storage tanks.

The TCPA is inapplicable to sellers who are "not in the business of selling property as owners or brokers." Ganzevoort v. Russell, 949 S.W.2d 293, 298 (Tenn. 1997). Although the Mountains argued in their memorandum supporting their motion for summary judgment and their appellate brief that the TCPA does not apply to them because they were not generally engaged in the business of selling real property, they did not support this assertion by affidavit or in their deposition testimony. As we have stated, a summary judgment movant bears the initial burden of presenting evidence that either affirmatively negates an essential element of the nonmoving party's claim, or shows that the nonmoving party cannot prove an essential element of the claim at trial. Hannan, 270 S.W.3d at 5, 7. "If the moving party fails to make this showing, then 'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for

summary judgment fails.'" Martin, 271 S.W.3d at 83 (quoting McCarley v. W. Quality Food Serv., 960 S.W.2d 585, 588 (Tenn. 1998)). The Mountains did not affirmatively negate an essential element of the Stanfills' TCPA claim or show that the Stanfills cannot prove an essential element of their TCPA claim at trial, and thus summary judgment was inappropriate.

The TCPA is applicable to professional sellers of real estate such as Mr. Brooks. See Ganzevoort, 949 S.W.2d at 299. As previously noted, the Stanfills testified that as Mr. Brooks was showing him the property, Mr. Stanfill asked Mr. Brooks what the vent pipe was, and Mr. Brooks told him it was part of an old dairy operation that had once been on the property. In Ganzevoort, we observed that professional sellers of real property are obligated by the TCPA "to exercise good faith in disclosing to prospective purchasers material facts affecting the value of the property known to them and not known to or reasonably ascertainable by a prospective purchaser." Id.; see also Staggs v. Sells, 86 S.W.3d 219, 223 (Tenn. Ct. App. 2001) (noting that "'[b]efore a seller makes a representation, he is required to exercise reasonable care to make sure it is correct'") (quoting Akbari v. Horn, 641 S.W.2d 506, 508 (Tenn. Ct. App. 1982)). As we have observed, the presence of the old underground fuel storage tanks – potentially a significant environmental and financial liability – was definitely a material fact affecting the value of the property, and the tanks' presence was not readily ascertainable to a prospective purchaser. When Mr. Stanfill asked Mr. Brooks what the vent pipe was, Mr. Brooks gave an answer that was at best incomplete and misleading, and possibly completely false.[9]

The deposition testimony of Mr. Stanfill created a genuine issue of material fact as to whether Mr. Brooks violated a duty as a realtor representing the sellers[10] to ensure that his representations regarding the property were correct or to make a good-faith inquiry as to what the vent pipe actually was in order to fully and accurately answer Mr. Stanfill's question about it. A reasonable jury could reach the conclusion that Mr. Brooks violated his duty as a realtor, and is liable under the TCPA for "unfair or deceptive acts or practices" proscribed by the Act. Tenn. Code Ann. § 47-18-104(a). Accordingly, summary judgment in favor of Mr. Brooks on the Stanfills' TCPA claim was not appropriate.

## F. Discretionary Costs

The trial court awarded discretionary costs in the amount of $8,780.54 to Mr. Brooks and $8,676.75 to the Mountains. In light of our holding vacating summary judgment in part, the award

---

[9] There is no indication in the record as to whether the underground storage tanks actually were a part of the old dairy operation, or unrelated to the dairy operation.

[10] Although Mr. Brooks described his role as a facilitator, he also testified in his deposition that "Mr. and Mrs. Mountain hired my firm to sell their property," that he showed the property for the Mountains to prospective buyers, and that he had a contract with the Mountains to receive a five percent commission on the sale price of the property.

16

of discretionary costs is also vacated.[11]

### III.  Conclusion

The judgment of the Court of Appeals affirming the trial court's summary judgment regarding the claims resulting from the mold infestation of the house, in favor of Mr. Brooks on the Plaintiffs' claim of fraudulent concealment of the underground fuel storage tanks, and in favor of Mrs. Mountain on the plaintiffs' claim regarding the underground fuel storage tanks, is affirmed. The Court of Appeals' affirmance of summary judgment upon the  Stanfills' remaining claims is reversed, and the case is remanded for a trial on the merits of these claims.  The trial court's order awarding the Defendants discretionary costs is vacated.  Costs on appeal are assessed one-half to appellee Carl Brooks, and one-half to appellees John T. Mountain and Melony Mountain, for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE

---

[11] The award of discretionary costs in favor of the Mountains was also improper because the Mountains' motion was not timely filed.  Tennessee Rule of Civil Procedure 54.04(2) provides that "[s]ubject to Rule 41.04, a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment."  Had we affirmed summary judgment in this appeal, the award of discretionary costs in the Mountains' favor would still have been vacated because Mr. and Mrs. Mountain filed their motion 41 days after the trial court's entry of judgment.  The trial court should have denied the motion for discretionary costs as untimely.