271 N.J. Super. 136 (1993)
638 A.2d 165
JOHN JACKSON AND TRACEY JACKSON, PLAINTIFFS,
v.
MANASQUAN SAVINGS BANK, DEFENDANT.
Superior Court of New Jersey, Law Division, Monmouth County.
Decided September 20, 1993.
*137 Mark A. Troncone for plaintiffs (King, Kitrick, Jackson & Troncone, attorneys).
C. Keith Henderson for defendant (Lautman, Henderson & Wright, attorneys).
*138 Daniel S. Johnsen for proposed intervenors (Grossman & Kruttschnitt, attorneys).
CLARKSON S. FISHER, Jr., J.S.C.
This matter comes before this Court by way of the motion of defendant Manasquan Savings Bank ("the Bank") to dismiss the complaint for failure to state a claim upon which relief may be granted. The Bank also seeks an order discharging a lis pendens placed upon the real estate in question by plaintiffs John and Tracey Jackson ("the Jacksons"). The motion of Daniel and Renee Jahnsen ("the Jahnsens") to intervene for the purpose of asserting claims against the Jacksons and their attorneys, King, Kitrick, Jackson & Troncone, is also before this court. As the current owners, the Jahnsens contend that they have a right to be heard with regard to the Bank's motion to dismiss and, if the lis pendens is not lifted, that they should be permitted to assert a claim against the Jacksons and their attorneys for tortious interference with their contractual relationship with the Bank.

I. FACTS
The Bank was the successful bidder on the real estate and improvements located at 616 Isham Circle, Brielle, New Jersey ("the property") at a sheriff's sale that was held on March 29, 1993. The sheriff's deed, showing the Bank as grantee, was executed on April 19, 1993, and recorded on May 3, 1993.
In an effort to sell the property, the Bank placed an advertisement in the Asbury Park Press and began accepting bids.[1] Early in the morning of June 11, 1993, plaintiff Tracey Jackson learned *139 of this and contacted her realtor, Denise Tortorello. Tortorello contacted William Campbell, a representative of the Bank, that morning (between 8:30 and 8:45 a.m.). Campbell told her that the Bank had already received several offers for the property and that if the Jacksons were interested in making a bid they could examine the property that morning.
Later that morning, Tortorello was advised by Steven Yarosz, another representative of the Bank, that the Bank was cutting off the bidding at noon that day. When Tortorello informed Yarosz that the Jacksons were prepared to offer approximately $200,000, Yarosz agreed to extend the cutoff time to 1:00 p.m. to allow the Jacksons an opportunity to examine the premises. Thereafter, Campbell and the Jacksons agreed to meet at the property at approximately 11:15 a.m. Yarosz indicated that a decision by the Bank as to which offer would be accepted would be made that day. In a later conversation, Yarosz indicated that the highest bid would be that which netted the Bank the greatest amount.[2]
At 11:30 a.m., the Jacksons met with Campbell at the property. Campbell advised them that the Bank would sell the property to the "best bidder." According to Campbell, the "best bid" would be determined by a number of variables, including the size of the deposit and the bidder's creditworthiness. Campbell urged the Jacksons to submit their highest and best bid since there would be no second chances.
A contract prepared by Tortorello and executed by the Jacksons (for a purchase price of $200,000 and a real estate commission of $6000) was telecopied to the Bank at 12:41 p.m. This document was never executed by the Bank.
John Jackson telephoned Mr. Yarosz later that day in an attempt to learn whether he and his wife were the highest bidders. At approximately 4:00-4:30 p.m., Yarosz returned this telephone *140 call and advised Mr. Jackson that the Bank was "changing" the process to maximize its efforts at obtaining a suitable sales price. Yarosz stated that the Bank would open the bids to the bidders and give all of them an opportunity to amend their bids. He told the Jacksons that their $200,000 bid was considered to be $194,000 due to the $6,000 real estate commission (see n. 2, supra); he also indicated that the Bank had received two bids of $185,000, one of $180,000, and one of $175,000. All of the bidders were given until Monday, June 14, 1993, to make an amended bid, and were advised that the Bank would make its determination on the following day.[3]
The Jacksons did not amend their bid. The next week, they learned that the Bank had agreed to sell the property to the Jahnsens.
The Jacksons filed a complaint in this Court on June 30, 1993. The first count alleges a breach of the Consumer Fraud Act (N.J.S.A. 56:8-1 to -60), the second count alleges that the Bank breached its agreement to sell the property to the highest bidder, and the third count alleges that the Jacksons have no adequate remedy at law. Besides damages, the Jacksons seek specific performance of the alleged contract of sale.

II. STATUTE OF FRAUDS
The Bank's motion to dismiss[4] is predicated on the Statute of Frauds. The Bank claims that it never executed a contract with *141 the Jacksons and, therefore, the Jacksons' claim against it must fail because the Statute of Frauds requires a contract for the sale of real estate to be in writing. The Jacksons, on the other hand, argue that the bidding process resulted in the formation of a contract that does not violate the Statute of Frauds. The motion raises two essential issues: (1) whether the facts set forth in the Jacksons' opposition support their argument that an agreement was reached by and between the Bank and the Jacksons for the sale of the property; and (2) whether there is a "writing... signed by the party to be charged." N.J.S.A. 25:1-5(d). Only in a few instances have our courts discussed the impact of the Statute of Frauds on a claim that a contract came into existence from a bidding process.
In Borough of Lodi v. Fravi Realty Company, 4 N.J. 28, 32, 71 A.2d 333 (1950), the Court held that an auction sale of land by a municipality falls within the Statute of Frauds. See also Buckley v. Mayor and Aldermen of Jersey City, 105 N.J. Eq. 470, 148 A. 630 (Ch. 1930), aff'd, 107 N.J. Eq. 137, 151 A. 905 (E. & A. 1930). In both cases, the courts considered whether the documentation that arose from the fact that the auction was conducted by a municipality constituted a writing sufficient to avoid the bar of the Statute of Frauds.
The Court in Buckley found the existence of a writing in the municipality's adoption of a resolution that specifically directed the sale to occur at a public auction. This resolution also expressly (1) authorized the municipality's counsel to draw a deed to the purchaser at the auction, (2) directed the municipality's mayor to execute the deed, and (3) directed the city clerk to affix the corporate seal. These conditions were contained in a notice that was subscribed by the municipality through its city clerk, and published. The court held that these various writings, when viewed together, constituted a binding contract. The municipality was bound by the fact that all essential terms of sale were unanimously authorized by resolution. Further, the city clerk's execution of the notice, according to the court, satisfied the *142 requirement of the Statute of Frauds that there be a writing "signed by the party to be charged." Buckley, supra, 105 N.J. Eq. at 478-82, 148 A. 630.
The Buckley court's insistence upon a writing containing the agreement's essential terms and signed by the party to be charged is apparent throughout the opinion. The same is true of our Supreme Court's ruling in Fravi Realty where a similar, but less suitable, set of documents was found to be barred by the Statute of Frauds. In that case, the Court made the following observations:
Nevertheless, the instrument itself is, intrinsically, not such a writing as will sustain the action. It was not the auctioneer's book. It was not originated by him or for him. It is not and does not purport to be a record of what he did. Its composition is wholly in futuro; an undertaking to bid a minimum amount at an auction sale to be held a week after its date with an accompanying deposit as evidence of good faith; the deposit to be applied toward the purchase price in the contingency that the offerer became the successful bidder, and to be returned if he did not; with a further authority to the borough to retain an unnamed amount to help defray expenses if the offerer should fail to bid. The effort is to twist that undertaking into an accomplished contract of purchase and sale. A notation of essential facts for the use of the scrivener could be jotted upon that or upon any scrap of paper; possibly the essential items of the insertion, properly assembled and excluded from a contradictory setting, and done for the purpose of establishing an agreement, would have taken the case out of the statute. But the presence of those isolated items in a mere jumble of words does not constitute a memorandum of the agreement charged against the defendant. The writing, clearly, is not an agreement of purchase and sale, is not an authentication of sale and is not sufficiently intelligible to constitute a memorandum or note of such an agreement or of a sale. As related to that which it is held forth as proving, it does not make sense.
[Id. at 33, 71 A.2d 333.]
More recently, the Appellate Division also considered the application of the Statute of Frauds to the sale of real estate by auction. Golfinopoulos v. Padula, 218 N.J. Super. 38, 526 A.2d 1107 (App.Div. 1987). In that case, a sealed-bid proposal set forth certain "terms of sale" and stated also that the "[c]ontract will definitely be awarded on Friday, May 30, 1986 to the highest responsible bidder." Id. at 46, 526 A.2d 1107. The Appellate Division held that this provision "transformed the sale to the equivalent of a sale `without reserve.'" The court determined that *143 this notice constituted an offer and each bid constituted "a proposed acceptance made final upon the fall of the hammer or other indication that the bidding is closed." Id.
This case is a far cry from the previous experiences of our courts discussed above. In contrast to Golfinopoulos, the advertisement placed in the Asbury Park Press by the Bank contains no specific terms that would form the basis of an offer; particularly noteworthy is the absence of language indicating the definite awarding of a contract by a date certain to the highest responsible bidder.[5] Rather, the advertisement in question can be viewed only as an invitation to the public to inquire as to the purchase of this property. There is no suggestion in the advertisement that there would be an auction or other type of bidding process, nor that the property would be sold to the highest bidder by a certain date. Thus, this mere invitation from the Bank to the public to inquire about the property cannot, as a matter of law, be viewed as a "sale without recourse."
Simply, there is no writing purporting to memorialize the terms of an agreement or, if one could "twist [this] undertaking into an accomplished contract," Fravi Realty, supra, 4 N.J. at 33, 71 A.2d 333, there is no document signed by the party to be charged. The only writings purporting to qualify are the advertisement and the proposed contract that was telecopied to the Bank by the Jacksons on June 11, 1993[6]. Neither document was signed by the Bank, and thus the approach taken in Buckley and Fravi Realty, which permits the consideration of all the relevant documents collectively, *144 does not take this situation out of the Statute of Frauds. In short, accepting all that the Jacksons have urged factually as true, there is, as a matter of law, no written memorandum containing the essential terms of the alleged agreement[7] which was "signed by the party to be charged."[8]
The Jacksons' claim of a breach of contract must fail as a matter of law. Accord Kopp, Inc. v. United Technologies, 223 N.J. Super. 548, 539 A.2d 309 (App.Div. 1988). The agreement alleged is one which, in the language of the Statute of Frauds, "[n]o action shall be brought upon." N.J.S.A. 25:1-5. Thus, the claim of breach of contract contained in the second count of the complaint must be dismissed. It follows from that that the claim for specific performance must also be dismissed. Specific performance, quite obviously, is not available in the absence of an enforceable contract containing a promise, the performance of which the plaintiff would have this court compel. See, e.g., Konsuvo *145 v. Netzke, 91 N.J. Super. 353, 375-76, 220 A.2d 424 (Ch.Div. 1966). Since there is no enforceable contract, there can be no relief in the form of specific performance.

III. LIS PENDENS
It is also readily apparent that the lis pendens filed by the Jacksons must also be discharged. N.J.S.A. 2A:15-6 authorizes the filing of a lis pendens to enforce a lien upon real estate. The statute, however, leaves no doubt that a lis pendens shall not be filed "in an action to recover a judgment for money or damages only." Since the claim for specific performance must be dismissed, the lis pendens must be discharged since the Jacksons are left with only a claim for damages.

IV. CONSUMER FRAUD CLAIM
The question that remains is whether the Jacksons' claim for damages under the Consumer Fraud Act (N.J.S.A. 56:8-1 to -60) is actionable under these circumstances. Although this court has determined that no action may be maintained upon the alleged contract of sale of the property, that does not necessarily bar a claim for damages based upon the Consumer Fraud Act.
The Bank suggests that the Act applies only to misrepresentations or unconscionable practices "engaged in by professional sellers seeking mass distribution," Kugler v. Romain, 58 N.J. 522, 536, 279 A.2d 640 (1971), and "not to the isolated sale of a single family residence by its owner." DiBernardo v. Mosley, 206 N.J. Super. 371, 376, 502 A.2d 1166 (App.Div. 1986), certif. denied, 103 N.J. 503, 511 A.2d 673 (1986). Since the Jacksons' motion has not focused on this particular issue, it seems premature to determine the proper scope of the Jacksons' consumer fraud claim beyond the discussion above as to the application of the Statute of Frauds. Assuming the Bank's view of the Act's application to an isolated sale of a home to be correct, it is conceded in the Bank's motion papers that the Bank has marketed such properties in the *146 past, albeit infrequently. Unlike the seller in DiBernardo, the Bank is a sophisticated commercial entity whose purpose in purchasing the property at the Sheriff's sale and rapid resale via this bidding process was no doubt intended to reap a profit. DiBernardo dealt with the sale of a home by its owner. In holding that such a sale did not fall within the ambit of the Consumer Fraud Act, the Appellate Division did not focus on the fact that the seller infrequently sold real estate, but rather that the Act was only intended to apply to "unconscionable commercial practices." N.J.S.A. 56:8-2 (emphasis added). See DiBernardo, supra, 206 N.J. Super. at 374, 502 A.2d 1166. It cannot be said at this stage that the Bank was not engaged in a "commercial" practice. Indeed, the opposite seems true.
Whether the alleged alterations in the bidding process constitute misrepresentation or unconscionable practices is very much disputed as well. On the present record, this court is not prepared to say that DiBernardo bars the application of the Act to the Bank in this case or that the Jacksons have not stated a maintainable consumer fraud claim even though the alleged actions of the Bank never resulted in the creation of a contract between the parties.

V. MOTION TO INTERVENE
The Jahnsens moved to intervene for purposes of being heard with respect to the Bank's motion to dismiss and, in the event the lis pendens is not discharged, to be permitted to file a claim against the Jacksons and their attorneys for tortious interference with their contract with the Bank and for other similar relief.[9] In light of this court's dismissal of the breach of contract allegations *147 and the claim for specific performance, and in light of this court's discharge of the lis pendens, this court will assume that the Jahnsens no longer have an interest in intervening, and thus will deny their motion without prejudice.

VI. CONCLUSION
As set forth above, the claim of breach of contract and the claim for specific performance shall be dismissed pursuant to R. 4:46. The lis pendens shall be discharged as well. The motion, insofar as it seeks dismissal of the claim based on the Consumer Fraud Act, will be denied. The motion to intervene will be denied without prejudice.
The Bank's counsel shall submit an appropriate order memorializing all of this court's rulings contained in this opinion pursuant to the five day rule.
NOTES
[1] The facts set forth herein are derived from the certifications of John Jackson and Denise Tortorello which were submitted in opposition to the motion to dismiss. In light of the standard governing the disposition of such motions, this court must, and will, assume the facts presented by the Jacksons to be true, and all inferences will be drawn in the Jacksons' favor. See Velantzas v. Colgate Palmolive Co., 109 N.J. 189, 192, 536 A.2d 237 (1988); Parker v. M & T Chemicals, Inc., 236 N.J. Super. 451, 453, 566 A.2d 215 (App.Div. 1989).
[2] In other words, the Jacksons' $200,000 bid, which required the deduction of a $6000 real estate commission, would be considered by the Bank to be a $194,000 bid.
[3] The Bank disputes that the process as originally defined was ever modified. See Yarosz Certification (August 5, 1993), paragraphs 5 to 12. In light of the fact that the Bank has moved to dismiss the Jacksons' complaint for failure to state a claim upon which relief may be granted, this court must accept, as noted above, the Jacksons' view of the bidding process and other relevant events to be true for purposes of this motion.
[4] Since the moving and opposing papers rely on certifications and facts outside the pleadings, this court will treat the motion to dismiss as a motion for summary judgment. See R. 4:6-2; Wang v. Allstate Ins. Co., 125 N.J. 2, 9, 592 A.2d 527 (1991).
[5] Oddly, the Jacksons have not urged that the advertisement is at all relevant to the issues. A copy of the advertisement was not even submitted until requested by this court after oral argument on these motions. The advertisement which appeared in the June 4, 1993, edition of the Asbury Park Press states in full:

BANK REPO  4 Bdrm., 2 bath Cape. Prestigious area. 616 Isham Circle. $225,000. Call 223-4450. Ask for ORE officer.
[6] As with the advertisement, it is also curious that neither party provided this court with a copy of the proposed contract until requested by this court during oral argument of these motions.
[7] To be precise, while there is a writing arguably containing the essential terms of an agreement to convey the property to the Jacksons (albeit unexecuted by the party to be charged), there is no memorandum or other writing in existence that contains the essential terms of the alleged agreement upon which this suit is based. In other words, there is no memorandum containing the essential terms of the Bank's alleged agreement to convey the property to the highest bidder by the end of June 11, 1993.
[8] The Bank urges, quite correctly, that even if the Bank had executed the contract that was telecopied by the Jacksons on June 11, 1993, it would have had an absolute, unfettered right to cancel that agreement for three business days thereafter. The proposed contract contains an attorney review clause that would permit the Bank's attorney to disapprove and cancel the contract for a period of three business days after execution. Such cancellation may occur for any reason. See Trenta v. Gay, 191 N.J. Super. 617, 621-22, 468 A.2d 737 (Ch.Div. 1983). In Trenta, the court dismissed, by way of summary judgment, a suit seeking specific performance where a fully executed (and otherwise enforceable) contract was cancelled during the attorney review period. This demonstrates that even if the Bank had executed the contract that the Jacksons telecopied, there still remained a three day period within which the Bank could have cancelled that contract. The existence of this clause negates the Jacksons' claim for specific performance and provides an alternative basis for the court's ruling herein.
[9] In support of dismissal, the Jahnsens argued that a "settlement" was reached whereby the Jacksons agreed to discharge the lis pendens if the Bank would agree to dismiss its counterclaim for slander of title. See Jahnsen Certification (September 2, 1993), paragraphs 11 to 13. Due to the late filing of the motion to intervene, no written response to these assertions was received prior to the return date of these motions. Accordingly, this court expresses no view as to whether this aspect of the dispute was, in fact, settled. Since the lis pendens will be discharged, this particular issue is moot.