**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2550-23

OSAMA EL-HELW,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

FAIRLEIGH DICKINSON
UNIVERSITY and FAIRLEIGH
DICKINSON UNIVERSITY
SCHOOL OF PHARMACY,

     Defendants-Respondents/
     Cross-Appellants.

_____

Argued June 3, 2025 – Decided September 8, 2025

Before Judges Gooden Brown and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-2118-19.

Alan J. Genitempo argued the cause for appellant/cross-respondent (Piro, Zinna, Cifelli, Paris & Genitempo, LLC, attorneys; Alan J. Genitempo, of counsel and on the briefs; Michael A. Koribanick, on the briefs).

Edward G. Sponzilli argued the cause for respondents/cross-appellants (Norris McLaughlin, PA, attorneys; Edward G. Sponzilli and Michael C. Townsend, on the brief).

PER CURIAM

Plaintiff Osama El-Helw appeals and defendant Fairleigh Dickinson University (FDU or the University) cross-appeals from the March 12, 2024 Law Division order granting summary judgment to the University and dismissing plaintiff's complaint for breach of contract, misrepresentation, and fraudulent inducement in connection with plaintiff's failed attempt to enroll in the University's dual degree master's program.[1]  In his appeal, plaintiff alleged that his acceptance of the terms on the University's webpage, which omitted a minimum grade point average (GPA) requirement, obligated the University to admit him into its dual degree program once he was admitted to the pharmacy school.  Plaintiff also claimed he was damaged by the University's misrepresentations or omissions because he would have otherwise completed a different pharmacy program.  In its cross-appeal, the University maintains that

_____

[1]  While the caption of the order granting summary judgment lists multiple defendants, the body of the order refers to only one "defendant" and states that FDU was "incorrectly referred to as Fairleigh Dickinson University and Fairleigh Dickinson University School of Pharmacy."  Both plaintiff and defendant refer to defendant in the singular in their appellate briefs. Accordingly, we refer to defendant in the singular other than in the case caption.

the trial court erred by not finding that plaintiff's claims were barred by the statute of limitations. For the reasons that follow, we affirm.

I.

We glean these facts from the summary judgment record, "giv[ing] the benefit of all favorable inferences to plaintiff[]." Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995)).

In 2008, the president of FDU, a private university in New Jersey, asked Dr. Michael Avaltroni, then a department chair, and Dr. Geoffrey Weinman, a dean, to explore expansion of FDU's graduate programs to include a pharmacy school. To facilitate this, Avaltroni met in 2010 with the appropriate accrediting organization, the Accreditation Counsel for Pharmacy Education (ACPE).

The ACPE's accreditation process has three steps, or "tiers." The first tier is "pre-candidate" status, which the ACPE awards when a school creates an "adequately rigorous" curriculum. The second tier in the process is "candidate" status, which is given when ACPE representatives conduct a second, on-site assessment and determine that there is "a continued move toward completion of the program build-out." The final tier is "full accreditation," which occurs only "after the graduation of the first school [class]" (Alteration in original).

3

Pharmacy school graduates may only sit for licensure if they enter an ACPE-accredited program.

In formulating its program, FDU decided to offer pharmacy school students the opportunity to obtain dual degrees in four years, a PharmD and a master's degree in one of eight fields. After the first year of pharmacy courses, qualifying students enrolled in the dual degree program would be able to take classes in one of these fields, with some courses counting toward both degrees.

Around February 2011, while in his junior year of undergraduate college, plaintiff was researching graduate degree opportunities and discovered FDU's website advertising the new pharmacy school. One page on the website (the Webpage) stated:

> All students who are accepted to the Medco School of Pharmacy[2] with a baccalaureate degree will be provided the opportunity to complete a [master's] degree in conjunction with the Doctor of Pharmacy degree. . . .
>
> . . . Students will be asked to select or opt[ ]out of a [master's] pathway at the end of their first professional year.[3]

---

[2] The name of the pharmacy school was changed prior to its opening.

[3] Plaintiff obtained this language using a tool called the "Wayback Machine." This tool is a "web crawler," a "program/software or programmed script that browses the [internet] in a systematic, automated manner" to "retrieve" pages

[(Emphasis added.)]

Plaintiff later admitted in his deposition that this passage used the word "opportunity," not "guarantee," but testified that the dual degree program's marketing on the University's website, at open houses, in person, and via email made him believe that anyone admitted into the program would be accepted into a master's program. Plaintiff also admitted during motion practice that none of the archived captures of the Webpage listed required coursework for the various master's degrees, stated how many credits were required to attain the master's degrees, discussed what would happen if a student failed a course, or mentioned the academic dishonesty policy or student fees.

On February 26, 2011, plaintiff sent an online inquiry to FDU asking whether a minor in chemistry would be "sufficient background" for him to pursue a master's degree in pharmaceutical chemistry as part of the dual degree program. Avaltroni emailed plaintiff back, confirming that the minor would be "adequate" and that the pharmacy school would begin accepting applications "later th[at] spring." Avaltroni later testified at his deposition that he only meant

---

and "insert them [in]to [a] local repository." Mohammad Abu Kausar et al., Web Crawler: A Review, 63 Int'l J. of Comput. Applications, no. 2, 31, 31 (2013).

this undergraduate background would "adequate[ly] prepar[e]" plaintiff for the coursework of that master's program.

At his deposition, plaintiff stated that he applied to the FDU pharmacy school around October 31, 2011, and did not apply to any other schools. He testified that he was aware the school was not fully accredited at the time, but that he would have given "much more []consideration" prior to applying if the Webpage had listed a 3.0 GPA requirement. When plaintiff applied, he signed FDU's terms and conditions, which included the following:

> It is agreed and understood that the signing of this application constitutes an agreement on the part of the student to abide by all rules and regulations of the University.
>
> Students who accept enrollment to the University agree to abide by all the rules and regulations now or hereafter promulgated [by] the University. Any student failing to comply with such rules and regulations may be dismissed by the University.

Additionally, FDU's "Policies and Procedures" document was available to students on its website. The document read:

> The University reserves the right in its sole judgment to make changes of any nature in the University's academic program, courses, schedule or calendar whenever in its sole judgment it is deemed desirable to do so. The University also reserves the right to shift colleges, schools, institutes, programs, departments or courses from one to another of its campuses. The

A-2550-23

foregoing changes may include, without limitation, the elimination of colleges, schools, institutes, programs, departments or courses; the modification of the content of any of the foregoing; the rescheduling of classes, with or without extending the announced academic term; and the cancellation of scheduled classes or other academic activities.

FDU's pharmacy school achieved pre-candidate status by 2012 and was permitted to admit students for the 2012 fall semester. On March 1, 2012, plaintiff was admitted into the pharmacy school and accepted the same day. He subsequently obtained his undergraduate degree with a 2.986 GPA.

The ACPE performed a site visit in May 2012, resulting in the pharmacy school being granted candidate status in July 2012.[4] At his deposition, Avaltroni stated that the ACPE informed FDU it would only approve the dual degree program if FDU restricted admission into the master's portion of the program to students who had met "high academic standards," to avoid "jeopardiz[ing]" lower-performing "students from completing the [PharmD]." As a result, FDU decided to restrict the dual degree program to students who achieved a 3.0 GPA in the first year of their pharmacy courses. Avaltroni also testified that any

---

[4] Avaltroni testified that if the school had not achieved candidate status, all admitted students could have "pull[ed] out at any time" and had any money paid to FDU refunded.

A-2550-23

iteration of the pharmacy school's website after the "initial accreditation" in May or June 2012 would have listed the 3.0 GPA requirement.

Plaintiff disputed whether the Webpage was updated in spring or summer 2012 to reflect this requirement. At his deposition, he claimed that he checked FDU's website "daily" until the pharmacy school indicated that it received initial accreditation because, otherwise, he would not have been able to start classes in fall 2012. However, he testified that he did not "specifically" notice changes to the website's "verbiage" and stopped checking it altogether by the time classes started around August 26, 2012.

Plaintiff provided archived facsimiles of the Webpage showing that the GPA requirement was not present on May 12, 2012, but had been added by September 22, 2012, about four weeks after he had started classes. The University concedes for purposes of this appeal that the version of the Webpage listing the 3.0 GPA requirement was published on September 22, 2012. That version read:

> Students who are accepted to the [pharmacy school] with a baccalaureate degree may have the opportunity to pursue a [master's] degree in conjunction with the Doctor of Pharmacy degree following completion of the first professional year of the [p]harmacy curriculum— providing the opportunity for students to select a focused pathway of study while meeting the Doctor of Pharmacy curricular requirements.

8

The integration of required master's courses within the pharmacy program curriculum may allow students to complete both degrees, with overload courses required for some master's programs offered as evening, Saturday or online courses.

Students interested in a dual degree will be required to meet the admissions requirements for the selected second-degree pathway, in addition to maintaining a 3.0 grade point average within the Doctor of Pharmacy curriculum.

In addition to the Webpage, Avaltroni testified at his deposition that FDU published the GPA requirement in the graduate student bulletin/manual (Bulletin), which was distributed to students at orientation, as well as the "School of Pharmacy Concurrent Degree Enrollment Program Guidelines and Overview" (Overview), a document "circulated to students" that listed the curricula for the eight dual degrees. Dr. James Almeida, an associate dean for graduate programs, also testified in his deposition that the requirement was in the Bulletin. Plaintiff admitted during motion practice that students received the Bulletin at new student orientation and that he attended orientation, which occurred between August 19 to 21, 2012.

The Bulletin read in pertinent part:

The University reserves the right to change, without prior notice, the contents of its [b]ulletins and to modify its academic calendar and programs of instruction; academic and disciplinary requirements, policies and

9

procedures, [and] rules and regulations; [and] its tuition, fees and charges, and the terms of financial aid. Changes shall be effective upon publication or when the University otherwise determines, and any such change may apply to prospective students and to those already enrolled.

The relevant portion of the Overview stated:

A student must have a 3.0[] cumulative GPA during their first year within the program to be considered for admission to this concurrent degree pathway.

A student must maintain an overall 3.0[] GPA within all pharmacy course[work] during their entire course of study. If the student['s] GPA falls below 3.0[], he or she will be asked to defer taking courses within the master's program until completing the Doctor of Pharmacy degree.

In his deposition, Avaltroni also claimed that FDU staff discussed the GPA requirement both at new student orientation and as part of required "beyond the curriculum" courses taking place in the fall and spring semesters of the students' first year. However, another school administrator testified in his deposition that plaintiff failed to register for a "beyond the curriculum" course until the spring of his first year.

On July 23, 2013, FDU placed plaintiff on academic probation due to his GPA falling to 2.68, below the minimum of 2.75. As a result, FDU informed plaintiff he could not enroll in the dual degree master's program. Avaltroni

10

testified at his deposition that between twenty and twenty-five students of the inaugural class were accepted into a master's program. Avaltroni stated he believed "a few students," including plaintiff, were denied based on the "criteria and cutoffs" FDU had in place. Plaintiff testified at his deposition that he knew of "[a]bout ten" students who were denied admission into a master's program.

Undeterred, plaintiff inquired about applying directly to the Master of Business Administration (MBA) program. Almeida, Avaltroni, and then provost of FDU, Dr. Christopher Capuano, discussed plaintiff's inquiry in a series of emails sent on August 1, 2013. Capuano and Almeida were initially open to allowing plaintiff to apply as long as he met traditional master's program requirements, but Avaltroni expressed concern that plaintiff would "end up failing out of both" the MBA and PharmD programs. Avaltroni also indicated he had assured the ACPE during its site visit that he would "monitor [dual degree] student progress closely," and had been telling pharmacy students on academic probation to wait until they were off of probation to sign up for courses outside of the pharmacy curriculum. Capuano and Almeida suggested instituting a rule that dual degree students would need permission from the pharmacy program to matriculate into a master's program, and Almeida agreed

11

to inform plaintiff "that he should get himself off the academic probation list[] before he [would] be authorized to take MBA courses."

In his deposition, Almeida stated he was unaware of the pharmacy school's written policy on applying for the master's portion of the dual degree program but that Avaltroni had a policy in place to respond to the concerns the ACPE had expressed in the summer of 2012. Almeida claimed that students "were essentially told" by others, and "certainly by [him]," that they would "have to apply for admission into the MBA program" and "complete a form." Later, they would "be notified whether they [were] admitted." Almeida therefore maintained that students were told that dual admission into a master's program was an "opportunity" that was up to the discretion of FDU administration.

Plaintiff took five years to finish the four-year pharmacy program and graduated with a 3.2 GPA. He received at least seven grades in the C range and had to take two "remediation" courses because professors believed he had not "learned a baseline of information." FDU also placed him on academic probation again on June 23, 2014. Twenty other students from the inaugural class of almost eighty were also placed on academic probation in 2014.

By the 2016 fall semester, plaintiff's GPA had risen above 3.0. He emailed Avaltroni to inform him that he only needed two classes to complete the required

A-2550-23

coursework for an "MHS-Informatics degree" and to request admission into that master's program. Avaltroni replied that plaintiff "misinterpreted the guidelines for admission to the MHS program," which "require[d] a 3.0[] GPA to begin, not at midpoint or near completion." As plaintiff did not have that GPA by the end of his first year or the conclusion of spring semester 2013, he "w[as] not considered for th[e] program." At their respective depositions, Almeida and Avaltroni stated that eligibility for a master's program was only determined once—at the end of a student's first year. Plaintiff administratively appealed the denial, and the pharmacy school affirmed its decision.

On March 19, 2019, plaintiff filed a complaint against the University alleging that: (1) an implied contract was created from plaintiff's acceptance of the dual degree program offer on the University's Webpage, and the University breached that contract by "not granting [p]laintiff automatic enrollment" into the MBA program (count one); (2) the University misrepresented the terms of the dual degree program by "omitt[ing] any mention of the minimum secondary requirements with the intent to lure" plaintiff to the school (count two); and (3) the University fraudulently induced plaintiff to enroll because of this omission

A-2550-23

(count three).[5]  Plaintiff claimed that he "would not have enrolled" in the pharmacy school if not for the University's misrepresentations and omissions on its website and in its marketing campaign.  Among other remedies, plaintiff sought specific performance and compensatory and punitive damages.

After the trial court denied the University's motion to dismiss the complaint for failure to state a claim as well as the University's motion for reconsideration, the University moved for summary judgment, arguing there was no enforceable contract and, if there was, it was time-barred under the applicable statute of limitations.  Following oral argument, the trial judge entered an order on March 12, 2024, granting the University's motion and dismissing the complaint with prejudice.  In an accompanying oral opinion, the judge outlined the facts, procedural history, and governing legal principles.

Addressing plaintiff's breach of contract claim, the judge explained "[i]t has been established that the relationship between a student and a university is far from purely contractual" in New Jersey.  The judge acknowledged that "[c]ourts considering breach of contract claims in the education context have required the [p]laintiff to identify a specific policy that the university breached

_____

[5]  The complaint contained a fourth count re-alleging the prior claims of fact and law against fictitious defendants.

and allege how the university breached it in a substantial way that exceeds the wide bounds of discretion afforded to universities."

Applying these principles, the judge concluded there was no enforceable contract. The judge explained:

> [The University] argues that no reasonable juror can conclude that the FDU website, when initially seen by [p]laintiff, was a contract. The website did not explain how th[e] "opportunity" [to matriculate into a master's program] would be realized. It did not address requirements such as GPAs, test scores, or other regularly encountered admission prerequisites.
>
> It did not explain what courses may be required for admission into a . . . master's program.
>
> Plaintiff admitted that the website contained only the barest of information regarding the dual degree program.
>
> For [p]laintiff to assume he was guaranteed admission into a master's degree [program] simply because he was offered an opportunity to earn two degrees in four years does not equate to an enforceable contract.

The judge stressed there was no dispute "that [p]laintiff . . . understood [d]efendant's advertisement used the word opportunity and not guarantee." Even if plaintiff's acceptance of the Webpage's terms had created a contract, the judge found that the University did not breach it. In support, the judge highlighted the

15

University's express reservation of rights in the Bulletin, including its right to modify academic requirements without prior notice.

Moreover, the judge found that

> [l]ike all other pharmacy doctoral students, [p]laintiff was given the opportunity to earn a master's degree while earning [his] doctorate degree. But to take advantage of that opportunity, students needed to maintain a 3.0 GPA and succeed in their coursework.
>
> Plaintiff's lack of performance resulted in a 2.67 GPA and lost him the opportunity to pursue a master['s degree]. But [p]laintiff did obtain a PharmD degree[ from an] accredited [school, which] made him eligible for licensure.

In rejecting plaintiff's misrepresentation and fraudulent inducement claims, the judge explained that

> [m]isrepresentation and fraud claims require proof of both a misrepresentation or omission and reliance by the [p]laintiff on that misrepresentation.
>
> . . . .
>
> Plaintiff relied on [the] [U]niversity's website which contained what was essentially an advertisement of the [U]niversity's dual [degree] program.
>
> Plaintiff's complaint is based on the omission of the admission standard for the dual degree[ program], but a graduate program has admission standards like maintaining a [certain GPA].

A-2550-23

The judge thus concluded it was unreasonable for plaintiff to rely upon the website's omission of the GPA requirement because it "contained only the barest of information regarding the dual degree program." The judge acknowledged the University's statute of limitations argument but noted that "the date of the onset of [p]laintiff's alleged injury [was] in dispute." Nonetheless, because the judge dismissed plaintiff's claims on substantive grounds, she did "not mak[e] any ruling as to [the University's] statute of limitations" argument. This appeal and cross-appeal followed.

On appeal, plaintiff argues the judge erred in granting the University summary judgment because there were genuine issues of material fact in dispute and plaintiff established prima facie claims of breach of contract, misrepresentation, and fraudulent inducement. Plaintiff also asserts that the University did not act in good faith when it implemented the GPA requirement after the inaugural class began in the fall semester and because it failed to explicitly state the period to select or opt out of the dual degree program. In its cross-appeal, the University argues the judge erred by not ruling that plaintiff's claims were barred by the six-year statute of limitations.

17

II.

We review a trial court's summary judgment ruling "de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That standard is well settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. R. 4:46-2(c); see Brill, 142 N.J. at 540. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted. R. 4:46-2(c); see Brill, 142 N.J. at 540.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (citations reformatted).]

Whether a genuine issue of material fact exists depends on "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 523. However, "Rule 4:46-2(c)'s 'genuine issue [of] material fact' standard mandates that the opposing party do more than 'point[] to any fact in dispute' in order to

18

defeat summary judgment." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (alterations in original) (quoting Brill, 142 N.J. at 529). "If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of Rule 4:46-2." Brill, 142 N.J. at 540.

"If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007), overruled on other grounds by, Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558 (2012)). "We review issues of law de novo and accord no deference to the trial judge's [legal] conclusions . . . ." MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super. 307, 312 (App. Div. 2018).

"[S]ummary judgment cannot be defeated if the non-moving party does not 'offer[] any concrete evidence from which a reasonable juror could return a verdict in [that party's] favor[.]'" Housel v. Theodoridis, 314 N.J. Super. 597, 604 (App. Div. 1998) (second and fourth alterations in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). As such, "[s]ummary judgment should be granted, in particular, 'after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Thus, the non-moving party "has the 'burden of producing . . . evidence that would support a jury verdict[,]' and must 'set forth specific facts showing that there is a genuine issue for trial.'" Housel, 314 N.J. Super. at 604 (alteration in original) (quoting Anderson, 477 U.S. at 256).

III.

Turning to the merits, plaintiff first argues that the judge erred in finding the University's webpage was just an advertisement, arguing that an implied-in-fact contract was formed when he "appl[ied] and enroll[ed] into the [dual degree] program." Plaintiff contends "his understanding of the plain language" was confirmed by Avaltroni pre-application and by FDU staff at open houses post-application, and that the University "promised [him] the ability and opportunity to enter the dual degree program, as he had the proper prerequisites."

At the outset, we acknowledge that New Jersey courts do not evaluate the university-student relationships in strict contractual terms. See Beukas, 255 N.J.

20 A-2550-23

Super. 552, 566;[6] <u>Mittra v. Univ. of Med. & Dentistry of N.J.</u>, 316 N.J. Super. 83, 91-92 (App. Div. 1998). Nonetheless, because plaintiff's complaint alleges a standard breach of contract cause of action, we begin with a traditional contract analysis.

In order to prove a breach of contract claim, a plaintiff must show that: (1) "the parties entered into a contract containing certain terms;" (2) the plaintiff fulfilled its obligations under the contract; (3) the defendant failed to perform its obligations under the contract, "defined as a breach of the contract;" and (4) the plaintiff sustained damages as a result. <u>Woytas v. Greenwood Tree Experts, Inc.</u>, 237 N.J. 501, 512 (2019) (quoting <u>Globe Motor Co.</u>, 225 N.J. at 482). "Each element must be proven by a preponderance of the evidence." <u>Globe Motor Co.</u>, 225 N.J. at 482.

The threshold question in evaluating a breach of contract claim is whether a contract was formed. "'[T]he basic features of a contract' are 'offer, acceptance, consideration, and performance by both parties.'" <u>Goldfarb v. Solimine</u>, 245 N.J. 326, 339 (2021) (alteration in original) (quoting <u>Shelton v. Restaurant.com, Inc.</u>, 214 N.J. 419, 439 (2013)). "'A contract arises from offer

_____

[6] Because both the trial court decision and the Appellate Division's affirmance appear in the same volume of the reporter, we retain the first page of each decision in all short citations.

and acceptance[] and must be sufficiently definite "that the performance to be rendered by each party can be ascertained with reasonable certainty.""" Ibid. (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992)). "Where the parties do not agree to one or more essential terms, . . . courts generally hold that the agreement is unenforceable." Weichert Co. Realtors, 128 N.J. at 435.

Critically, advertisements are generally not considered offers. See Restatement (Second) of Conts. § 26 cmt. b (A.L.I. 1981) (noting that general advertisements for services "are not ordinarily intended or understood as offers" and that "there must ordinarily be some language of commitment or some invitation to take action without further communication" to make them so); Schlichtman v. N.J. Highway Auth., 243 N.J. Super. 464, 468-69 (Law. Div. 1990) ("Generally it is considered unreasonable for a person to believe that advertisements . . . are offers that bind the advertiser." (quoting Mesaros v. United States, 845 F.2d 1576, 1581 (Fed. Cir. 1988))). Indeed, the terms of an advertisement must be sufficiently definite on its face for the advertisement to constitute an offer. See Jackson v. Manasquan Sav. Bank, 271 N.J. Super. 136, 143 (Law. Div. 1993) (finding that an advertisement could "be viewed only as an invitation to the public" because it "contain[ed] no specific terms that would form the basis of an offer"); see also Restatement (First) of Conts. § 25 (A.L.I.

1932) ("If . . . the promise[e] . . . knows or has reason to know that the person making [the promise] does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer.").

Applying these principles, we agree with the judge's determination that the Webpage was "essentially an advertisement." Plaintiff applied to the pharmacy school in October 2011 and accepted admission on March 1, 2012. Both the January 5 and March 24, 2012 versions of the Webpage stated that "[a]ll students who are accepted to the [pharmacy school] with a baccalaureate degree will be provided the opportunity to complete a [master's] degree in conjunction with the Doctor of Pharmacy degree" within four years. This is sorely lacking in essential terms for a university-student services contract, which, at a bare minimum, would include curriculum and cost of attendance. See generally Romeo v. Seton Hall Univ., 378 N.J. Super. 384, 395 (App. Div. 2005) ("A contractual relationship cannot be based on isolated provisions in a student manual."). As plaintiff conceded, no archived version of the Webpage listed the student fees, academic dishonesty policy, number of credits required to attain a master's degree, necessary coursework, or what would happen if a student failed a course.

Absent such essential terms, there can be no enforceable contract,

Weichert Co. Realtors, 128 N.J. at 435, and no reasonable person would interpret the Webpage on its own to be anything other than an "invitation to the public" to research the program and apply to the school. See Jackson, 271 N.J. Super. at 143. Stated differently, the Webpage's language does not indicate that a prospective student could bind the University by applying without further assent from the University. Rather, the Webpage invited students to "apply now," leaving the power to form a relationship with FDU.

We also reject plaintiff's implied-in-fact contract claims. "[C]ontracts implied in fact are no different than express contracts, although they exhibit a different way or form of expressing assent than through statements or writings. Courts often find and enforce implied promises by interpretation of a promisor's word and conduct in light of surrounding circumstances." Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 144 N.J. 564, 574 (1996); see also Model Jury Charges (Civil), 4.10E, "Express or Implied Contract" (approved May 1998) ("An implied contract is one in which the parties show their agreement by conduct. For example, if someone provides services to another under circumstances that do not support the idea they were donated or free, the law implies an obligation to pay the reasonable value of services.").

Here, no conduct of the parties before or after plaintiff's October 2011

A-2550-23

application or March 2012 acceptance suggests mutual assent that plaintiff was guaranteed admission into the master's program after his first year of pharmacy school. Avaltroni's response to plaintiff's February 26, 2011 online inquiry merely stated that plaintiff's minor in chemistry would be "adequate" background to prepare plaintiff for a master's program in pharmaceutical chemistry. Plaintiff did not ask for all program requirements, and Avaltroni never stated that plaintiff's minor would guarantee him a spot in the pharmaceutical chemistry master's program.

Plaintiff's vague testimony that he received information at an open house which "supported th[e] premise" that pharmacy students were guaranteed admission into a master's program is also unconvincing. Plaintiff never claimed that an FDU employee stated the dual degree program did not have a GPA requirement. He testified only that he was told he was not barred from entering any of the eight master's programs based on his undergraduate background. Thus, there was no evidence showing plaintiff was promised the ability to enter the dual degree program, and hence no contract was formed.

Even if the words and actions of the parties created a contract, we agree with the judge that plaintiff did not demonstrate breach of contract. Plaintiff contends that the University breached by acting in bad faith, both by instituting

25

the GPA requirement after classes started and by "implement[ing] a new policy[] on the fly[] to . . . prevent [p]laintiff from separately applying to the master's program." Plaintiff also argues that "FDU substantially deviated from its own rules and regulations" because "several FDU employees" informed him that "he would be able to matriculate [in]to the MBA program later" once his GPA rose to a 3.0 or higher.

Although the May 2012 version of the Webpage did not specify the 3.0 GPA requirement, it did not promise plaintiff he could enter a master's program irrespective of his school performance. Plaintiff admitted that the Webpage used the word "opportunity" instead of "guarantee." As we give contract terms their ordinary meaning, C.L. v. Div. of Med. Assistance & Health Servs., 473 N.J. Super. 591, 599 (App. Div. 2022), "opportunity" as applied here should be understood to mean "a chance" of entering the dual degree program, not a guarantee, Black's Law Dictionary 1316 (12th ed. 2024).

As the judge explained, plaintiff was afforded "the opportunity to earn a master's degree while earning [his] doctorate degree" but failed to maintain a sufficient GPA by the end of his first year to take advantage of that opportunity. It is undisputed that: (1) this failure is the reason he was denied admission to the MBA program; and (2) other students were able to enter the dual degree

program. Thus, there is no evidence that the University failed to perform its obligations under the purported contract to constitute a breach, only plaintiff's failure to fulfill his obligations. See Woytas, 237 N.J. at 512.

We are also convinced that the express reservation of rights in FDU's Bulletin precludes any finding of a breach. The Bulletin reserved FDU "the right . . . without prior notice . . . to modify its . . . programs of instruction[,] academic and disciplinary requirements, [and] policies and procedures." This language is similar to the reservation of rights found in Beukas. There, former dental students sued over the university's decision to close the dental school. Beukas, 255 N.J. Super. 420, 421. The university's graduate studies bulletin that had been "distributed to all graduate students[,] including dental students," allowed the university, coincidentally also FDU, to change its "program, courses, schedule, or calendar" and "eliminat[e] . . . colleges" "without limitation." Id. at 421-22. Assuming "for analytical purposes, that the . . . bulletins constituted an enforceable contract," we held that FDU could not have breached it because the "contract would include the reservation of rights." Id. at 422. The same is true here regarding the 3.0 GPA requirement. Thus, even if the University had instituted the requirement after the start of plaintiff's first year, the University expressly reserved the right to do so and would not be liable

27

for breach of contract.  See ibid.

Contract principles aside, as the judge noted, New Jersey jurisprudence has "established that the relationship between a student and a university is far from purely contractual."  Instead, the focus is on whether a university has treated students fairly and given them an opportunity to be heard.  See Beukas, 255 N.J. Super. 552, 566; Mittra, 316 N.J. Super. at 91-92.  Plaintiff maintains that FDU violated these principles by establishing the GPA requirement in 2013 "without process" after he had already completed his first year of school.  Plaintiff further contends that FDU acted in bad faith by implementing this policy "on the fly" to prevent him entering a traditional master's program and by advertising the dual degree program without posted "rules or regulations."

In Mittra, we considered breach of contract claims by a student who had been dismissed for poor academic performance.  316 N.J. Super. at 85-87.  There, the plaintiff alleged that the school's student handbook constituted a contract between the school and its students.  Id. at 86.  In addressing the plaintiff's claims, we affirmed the holding of Napolitano v. Trustees of Princeton University, 186 N.J. Super. 548, 563-67 (App. Div. 1982), "rejecting the rigid application of contractual principles to university-student conflicts involving academic performance and limiting our scope of review to a determination

28

whether the procedures followed were in accordance with the rules and regulations." Mittra, 316 N.J. Super. at 90.

We explained that

> [a]cademic evaluations of a student bear little resemblance to the type of inquiry traditionally performed by the courts. Similar to the decision of a professor as to the proper grade for a student in [a] course, the determination whether to dismiss a student for academic reasons "requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision-making." Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 90 (1978). A graduate or professional school is surely the best judge of its student's academic performance and [the student's] ability to master the required curriculum. Id. at 85 n.2. Rigid application of contract principles to controversies concerning student academic performance would tend to intrude upon academic freedom and to generate precisely the kind of disputes that the courts should be hesitant to resolve.
>
> [Mittra, 316 N.J. Super. at 91 (citations reformatted).]

We clarified that students are "not left unprotected," as courts can still intervene if a teaching institution (1) "violates in some substantial way its rules and regulations pertaining to student dismissals" or (2) fails to provide "'an academically[-]terminated [student] . . . "fair procedure."'" Id. at 91-92 (quoting Hernandez v. Overlook Hosp., 149 N.J. 68, 81 (1997)). Applying this framework, we affirmed the dismissal of the plaintiff's breach of contract claim.

Id. at 92.

Beukas, 255 N.J. Super. 552, involving a university-student conflict concerning an administrative decision rather than an academic one, is also instructive. As previously stated, in Beukas, dental students sought damages for the closure of the university's dental school, which closure had been triggered by a financial exigency, and claimed breach of a contract established by school bulletins and other university publications. Id. at 553-54, 558. The trial judge determined the "university-student 'contract' is one of mutual obligations implied, not in fact, but by law," or in other words, a "quasi-contract." Id. at 566. The judge explained that "[a] quasi-contract is not a true contract but arises because of considerations of equity and morality and is distinguished from an express contract or even one implied in fact which arises from mutual agreement and intent to promise." Ibid. The judge held that to resolve a university-student conflict, "[t]he inquiry should be: did the university act in good faith and, if so, did it deal fairly with its students?" Ibid. Answering in the affirmative, the judge dismissed the complaint, finding the university did not act arbitrarily or in bad faith "because it could no longer operate in a fiscally sound or educationally responsible way after state funding was withdrawn." Id. at 567-68; see also Dougherty v. Drew Univ., 534 F. Supp. 3d 363, 375-76 (D.N.J.

2021) (applying the Beukas standard and assessing if a university's decision was "arbitrary, made in bad faith, or lacking in fair notice"). We affirmed the trial judge's decision "substantially for the reasons expressed . . . in her opinion." Beukas, 255 N.J. Super. 420, 421.

Here, the University's decision to not admit plaintiff into the master's program is more akin to an academic decision than an administrative one. Nevertheless, the principles in both Mittra and Beukas are instructive.[7] Applying those principles, we are satisfied plaintiff has not met his burden because he has failed to show that the University acted arbitrarily or in bad faith, Beukas, 255 N.J. Super. 552, 567, substantially violated its rules and regulations pertaining to matriculation into the dual degree program, or denied him fair procedure, Mittra, 316 N.J. Super. at 91-92. Indeed, all record evidence indicates the opposite is true.

The University's GPA requirement, which functioned as a one-time checkpoint at the conclusion of a student's first year, was in place by the summer of 2012 and publicized to all students by the fall of 2012. The University thus

---

[7] Plaintiff argues that the judge erred by relying upon Mittra since "this matter does not relate to student grading or evaluation." We are unpersuaded. Plaintiff was denied admission to the dual degree program solely because of his poor academic performance in his first year. Further, the purpose of the denial was to prevent plaintiff from being dismissed from the pharmacy program.

31

adhered to its rules and regulations, complying with the mandates of <u>Mittra</u>. Regarding the <u>Beukas</u> standard, the August 1, 2013 email chain establishes that the University did not act arbitrarily or in bad faith by enforcing the GPA requirement or banning students from applying directly to the MBA program without permission from the pharmacy school. As an administrator involved in the accreditation process, Avaltroni was intimately familiar with the ACPE's concerns with the dual degree program and the policies FDU instituted as a result. Avaltroni wrote that plaintiff would "end up failing out of both [programs]" if allowed to matriculate into the master's program, especially since plaintiff was "already getting dangerously close in the PharmD track alone." Thus, the University acted rationally and in good faith by barring plaintiff from the dual degree program to increase his chances of graduating from the pharmacy school. <u>See</u> <u>Beukas</u>, 255 N.J. Super. 552, 567; <u>Mittra</u>, 316 N.J. Super. at 91.

We are also satisfied that plaintiff was afforded reasonable notice and a fair hearing because he received notice of the denial and was able to appeal the decision. <u>See</u> <u>Mittra</u>, 316 N.J. Super. at 85. Plaintiff fails to identify any school policy that FDU violated by following this procedure. In sum, because no contract was formed and the University acted in good faith and complied with

its established procedures, summary judgment dismissal of count one was properly granted.

IV.

Turning to the misrepresentation and fraudulent inducement claims, plaintiff argues that the University "misrepresented" and "concealed" the "requirements related to opting[ ]in to the dual degree program" from him "despite his significant efforts to gain . . . knowledge" of these requirements. Plaintiff maintains that the trial court failed to consider Avaltroni's response to plaintiff's pre-admission inquiry about his undergraduate minor and that Peter Beuchner "advised [p]laintiff that he would be able to take up to nine credits . . . in the master's track and matriculate [in]to the MBA program later when" he attained a 3.0 GPA or higher.[8] He concludes that the University and its agents made these affirmative misrepresentations to induce him to enroll at and "remain committed to FDU," he reasonably relied upon them, and he was damaged as a result because he could have transferred to another pharmacy program.

---

[8] Beuchner was apparently a "student loan person," but there is no indication in the record that he was involved with the pharmacy program. In fact, Almeida testified that he had never heard of Beuchner. Moreover, while plaintiff now alleges that Almeida and FDU employee Tracy Templin also misrepresented the GPA requirement to him after his admission, there is no evidence of this in the record.

33

To sustain a fraudulent misrepresentation claim,[9] a plaintiff must show:

> (1) [a] representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge as to whether it is true or false; (4) with the intention of misleading another party into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.
>
> [Richie and Pat Bonvie Stables, Inc. v. Irving, 350 N.J. Super. 579, 589 (App. Div. 2002) (quoting GMH Assocs., Inc. v. Prudential Realty Grp., 752 A.2d 889, 901 (Pa. Super. Ct. 2000)).]

Similarly, the elements of a cause of action for fraudulent inducement are: (1) "a material misrepresentation" by the defendant to the plaintiff "of a presently existing or past fact;" (2) "knowledge or belief" on the part of the defendant that the representation is false, and belief by the plaintiff that the representation is true; (3) an intent on the part of the defendant that the plaintiff rely upon the misrepresentation; (4) the plaintiff's "reasonable reliance" upon the misrepresentation; and (5) "resulting damages." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-73 (2005) (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997)). "Fraud is not presumed" and "must be proven by

---

[9]   Plaintiff did not specifically plead whether the misrepresentation was fraudulent or negligent. Given the facts recited in the complaint and plaintiff's contentions in his merits brief, we presume plaintiff is asserting a fraudulent misrepresentation claim.

A-2550-23

clear and convincing evidence." Stoecker v. Echevarria, 408 N.J. Super. 597, 617-18 (App. Div. 2009) (quoting Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395 (App. Div. 1989)).

An omission may also constitute fraud under these frameworks when a defendant knows the omission to be material, see Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J. Super. 31, 43 (App. Div. 2000), and the misrepresentation or omission "must relate to some past or presently existing fact," Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 380 (App. Div. 1960). Absent a plaintiff proving a defendant's intent to deceive, "[s]tatements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." Alexander v. CIGNA Corp., 991 F. Supp. 427, 435 (D.N.J.), aff'd, 172 F.3d 859 (3d Cir. 1998); accord Middlesex Cnty. Sewerage Auth. v. Borough of Middlesex, 74 N.J. Super. 591, 605 (Law Div. 1962), aff'd o.b., 79 N.J. Super. 24 (App. Div. 1963).

Applying these principles, we reject plaintiff's claims out of hand. Essentially, plaintiff has only pled that he was damaged by the omission of the GPA requirement on the Webpage because he "would not have enrolled" at FDU otherwise. Plaintiff never alleged he was harmed by false statements made after

35

he accepted enrollment at the pharmacy school. Accordingly, we deem plaintiff's claims based on the University's conduct after his acceptance waived. See Bauer v. Nesbitt, 198 N.J. 601, 610 (2009) ("If not pled in a complaint, a cause of action cannot spring to life for the first time in an appellate court opinion."); R. 4:5-2 (noting that complaints should "set[] forth a claim for relief" and "contain a statement of the facts on which the claim is based[] showing that the pleader is entitled to relief").

Procedural deficiencies notwithstanding, plaintiff's claims are substantively lacking as well. First, the Webpage did not contain a false statement since it only promised plaintiff the "opportunity" to enter the dual degree program. Second, as the judge found, plaintiff's reliance was unreasonable. For plaintiff to assume that the Webpage's language was the extent of the dual degree program's requirements was unreasonable, particularly given that FDU had its Policies and Procedures posted elsewhere on its website. Plaintiff's claims also fail because his admission into a master's program was a future event and he has provided no evidence of the University's intent to deceive him. See Middlesex Cnty. Sewerage Auth., 74 N.J. Super. at 605. We also reject plaintiff's argument concerning Avaltroni's response to his online inquiry as patently baseless because Avaltroni did not state that plaintiff's

36

undergraduate minor would guarantee him admission into a master's program.

Finally, Beuchner's statement to plaintiff does not establish a prima facie claim of fraud. Beuchner was affiliated with the financial aid office, and it is thus unlikely he would have knowledge of the dual degree program requirements. Furthermore, the University published the GPA requirement through its Webpage, orientation, Overview, and beyond the curriculum courses. Plaintiff's reliance on one employee's statement, disregarding the wealth of other available resources to the contrary, renders his ignorance of the GPA requirement unreasonable at best and willful at worst. Thus, we affirm the judge's summary judgment dismissal of counts two and three. Because we affirm the grant of summary judgment on the merits, we need not address FDU's cross-appeal and conclude that the judge did not err in declining to reach the statute of limitations issue.

To the extent we have not specifically addressed any of plaintiff's or defendant's remaining arguments, we deem them without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hasley*

Clerk of the Appellate Division

A-2550-23